# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3318

_____

Chinyere Jenkins,      *
     *
       Plaintiff - Appellee,      *
     *
      v.      *
     *    Appeal from the United States
Kansas City Missouri School District;    *    District Court for the
American Federation of Teachers,    *    Western District of Missouri.
     *
       Defendants - Appellees,      *
     *
State Defendants,      *
     *
       Defendant - Appellant.      *

_____

Submitted: November 14, 2007
Filed: February 27, 2008 (Corrected: 3/27/2008)

_____

Before RILEY, BOWMAN, and SMITH, Circuit Judges.

_____

BOWMAN, Circuit Judge.

This appeal arises out of the court-supervised desegregation of the Kansas City, Missouri, School District ("the District" or "the KCMSD"), which began with the filing of a lawsuit in 1977. Although the District was declared unitary and released from court supervision in 2003, some parties to the desegregation suit filed a motion

in the District Court[1] on February 22, 2006, asking the court to exercise ancillary jurisdiction and enjoin the State of Missouri and state officials (collectively, "the State") from acting in a manner inconsistent with earlier court orders (including an agreement between the KCMSD and the State incorporated in court orders). The movants (the KCMSD, a class of plaintiff schoolchildren, and the American Federation of Teachers Local 691) asserted that recent legislative action by the State violated orders issued in the desegregation suit by requiring the KCMSD to use property tax levy proceeds, which were dedicated to the repayment of court-ordered desegregation bonds, to fund charter schools. The District Court agreed, granted the motion, and issued a final order enjoining the State from requiring the KCMSD to divert to the charter schools tax levy funds that were traditionally withheld under Section 160.415.2(5) of the Missouri Revised Statutes. The State appeals the District Court's order. We affirm.

I.

In 1977, the KCMSD, members of the Kansas City School Board, and four schoolchildren filed suit against the State, suburban school districts surrounding the District, and various federal agencies. The complaint alleged that the defendants caused and perpetuated a racially segregated public school system in the Kansas City, Missouri, metropolitan area. The District Court[2] realigned the KCMSD as a defendant and converted the suit into a class action, making a plaintiff class of all present and future KCMSD students. After a 7½-month trial, the District Court dismissed the case against the suburban school districts and federal defendants, but found constitutional violations by the KCMSD and the State. Jenkins v. Missouri, 593 F. Supp. 1485

_____

[1]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

[2]The late Honorable Russell G. Clark, United States District Judge for the Western District of Missouri, presided over the case from its inception until May 1997 when the case was reassigned to Judge Whipple.

(W.D. Mo. 1984). The court determined that the State had mandated segregated schools for black and white children prior to 1954, id. at 1490, and held that the KCMSD and the State had not met their affirmative obligations to remove all vestiges of that dual school system, id. at 1504. We affirmed this holding in Jenkins v. Missouri, 807 F.2d 657 (8th Cir. 1986) (en banc) (Jenkins I),[3] cert. denied, 484 U.S. 816 (1987).

To address the vestiges of unconstitutional segregation, the District Court ordered remedial programs and capital improvements throughout the District. By the summer of 1987, the court had approved a series of capital improvement expenditures totaling approximately $110 million. In September 1987, the District Court approved a $187 million "long-range capital improvement plan aimed at eliminating the substandard conditions present in KCMSD schools."[4] Jenkins v. Missouri, 672 F. Supp. 400, 403 (W.D. Mo. 1987). These capital improvement costs were in addition to "other desegregation costs." Id. at 412. While the court had deemed the State and the KCMSD jointly and severally liable for desegregation remedies, the court also recognized that the KCMSD lacked the resources to pay its share of the costs and had exhausted all means of raising additional revenue.[5] Concluding that it was "left with no choice but to exercise its broad equitable powers" to effectuate a remedy, id. at 411, the District Court directed the KCMSD to issue capital

[3]This Court has heard over thirty appeals in this case. Where Roman numerals have previously been assigned to the Court's opinions, we include those numeric designations.

[4]The costs of capital improvements continued to multiply, and the total costs were over $540 million in 1995. See Missouri v. Jenkins, 515 U.S. 70, 78 (1995).

[5]Voters in the KCMSD had not approved a bond passage or tax levy increase since 1969. See Jenkins v. Missouri, 855 F.2d 1295, 1312 (8th Cir. 1988) (Jenkins II), aff'd in part and rev'd in part, 495 U.S. 33 (1990).

improvement bonds in the amount of $150 million[6] and ordered the property tax levy in the District increased to $4.00 per $100 of assessed valuation, id. at 412–13.[7] The court specifically earmarked the proceeds of the property tax increase for the retirement of the capital improvement bonds and ordered that a tax increase in an amount "required to pay the interest and principal of the bond indebtedness shall remain in effect until such time as the bonds are retired or until other provisions are adopted to insure their retirement." Order of Oct. 27, 1987, at 2. On appeal, we affirmed the issuance of the bonds. Jenkins v. Missouri, 855 F.2d 1295, 1304–07 (8th Cir. 1988) (Jenkins II), aff'd in relevant part, 495 U.S. 33 (1990). We also affirmed the District Court's action setting aside state law that limited the District's ability to increase its tax levy. Id. at 1308–15. We required that in the future, however, the amount of the levy be set by the KCMSD school board (rather than by the court), subject to a limit set by the court. Id. at 1314. The Supreme Court then considered the issue and, while holding that the District Court abused its discretion by setting the property tax levy itself, agreed with our proposal that the District Court authorize the KCMSD to levy property taxes at a rate necessary to fund the desegregation remedy and enjoin state laws that prevent the KCMSD from exercising this power. Missouri v. Jenkins, 495 U.S. 33, 51–58 (1990). Pursuant to these orders, in 1990, the KCMSD increased the levy to $4.96 per $100 of assessed valuation. See Jenkins v. Missouri, 943 F.2d 840, 842 (8th Cir. 1991) (Jenkins VI).

The District Court—and our Court—continued to oversee the desegregation efforts. The case came before the Supreme Court again in 1995. In Missouri v. Jenkins, 515 U.S. 70 (1995), the Supreme Court determined that the District Court had exceeded its power in ordering particular remedies. The Supreme Court found "that

---

[6]In 1993, the District Court approved the issuance of additional bonds totaling $160 million.

[7]The District Court also ordered an income tax surcharge, but that order was reversed on appeal.

many goals of [the District Court's] quality education plan already have been attained," id. at 102, and directed that on remand, the District Court "bear in mind that its end purpose is not only 'to remedy the violation' to the extent practicable, but also 'to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution,'" id. (quoting Freeman v. Pitts 503 U.S. 467, 489 (1992)). This order changed the direction of the case, refocusing the court and the parties on the goal of ending court supervision of the District.

In April 1996, the State filed a motion asking the District Court to declare the District unitary, to dissolve all injunctions, and to relinquish jurisdiction in the case. Less than a month later, the State and the KCMSD entered into an agreement ("Agreement" or "1996 Agreement") whereby the State agreed to pay $314 million (later increased to $320 million) in desegregation funding to the KCMSD over a three-year period. The Agreement provided that upon final payment by the State and approval of the Agreement by the District Court, the State would be entitled to an order releasing it from further desegregation obligations and the jurisdiction of the court. Consistent with the State's role throughout the remedial phase of the case, the Agreement focused only on the amount of funding, not on the use of the funds. The American Federation of Teachers Local 691 ("AFT"), an intervener in the case, joined the Agreement, but the plaintiffs did not. The State then filed a second motion asking the District Court to approve the 1996 Agreement and dismiss the State from the case. After a hearing on the motions, the District Court denied the motion for unitary status except with respect to extra-curricular activities. Jenkins v. Missouri, 959 F. Supp. 1151, 1179–80 (W.D. Mo. 1997). The District Court approved the Agreement, however, stating that it was reasonable to expect the KCMSD to be unitary within three years—around the time that the State would be making final funding payments. Id. at 1179. We affirmed the District Court's order in Jenkins v. Missouri, 122 F.3d 588 (8th Cir. 1997) (Jenkins XIV). The State made final payment to the KCMSD

under the 1996 Agreement on December 3, 1998, and the District Court[8] dismissed the State on January 28, 1999.

In 1998, Missouri passed legislation authorizing the creation of charter schools, i.e., "independent, publicly supported school[s]," in Kansas City and St. Louis. Mo. Rev. Stat. § 160.400. Charter schools established within the boundaries of the KCMSD are funded by diverting federal, state, and local education funding away from the KCMSD on a per-pupil basis.[9] Id. § 160.415.2(1). Recognizing the KCMSD's financial obligations under the desegregation revenue bonds, however, the legislature swiftly amended the charter-schools statute in 1999 so that "[t]he per pupil amount paid by a school district to a charter school [was] reduced by the amount per pupil . . . needed . . . for repayment of leasehold revenue bonds obligated pursuant to a federal court desegregation action." Id. § 160.415.2(5).

In March 2002, the District Court "declared the KCMSD unitary with regard to facilities, budget, transportation, and racial balance." Order of Mar. 29, 2002, at 22. With regard to the remaining discriminatory vestige, the student achievement gap, the District Court declared the KCMSD unitary and released it from court supervision on August 13, 2003. Am. Order of Aug. 13, 2003, at 30. The KCMSD's unitary status had no immediate effect on its funding. The property tax levy remained in place, the KCMSD continued to make scheduled payments on the revenue bonds, and the State continued to reduce the KCMSD's funding obligations to the charter schools under Section 160.415.2(5).

---

[8]As noted above, Judge Whipple began presiding over the case in 1997. This was one of his first significant orders in the case.

[9]"The school district must pay each charter school an amount based on the total enrollment of the charter school multiplied by the tuition for each charter school student, multiplied by the projected daily attendance of those students." Jenkins v. Sch. Dist. of Kansas City, Mo., 73 F. Supp. 2d 1058, 1065 (W.D. Mo. 1999), rev'd, 216 F.3d 720 (8th Cir. 2000) (en banc).

Then, in 2004, the State changed the rules of the game. The Missouri legislature enacted a new statute that authorized the Missouri Board of Fund Commissioners ("BFC")[10] to condition the KCMSD's withholding of funds under Section 160.415.2(5) on a finding that the KCMSD did not have adequate reserves to satisfy outstanding desegregation bonds:

> The [BFC] shall determine whether any governmental entity has sufficient fund balances to redeem leasehold revenue bonds obligated under a federal desegregation action. If the [BFC] determines that any governmental entity has sufficient fund balances to redeem or otherwise pay off such leasehold revenue bonds, the state board of education shall certify, under subdivision (5) of subsection 2 of section 160.415, RSMo, that no amount is needed by such governmental entity to repay such bonds.

Mo. Rev. Stat. § 33.315. Pursuant to the statute, the BFC met in April 2005 to determine whether the KCMSD had sufficient funds to redeem the leasehold revenue bonds. At the time, the balance owed on the bonds was approximately $160 million and the last of the bonds was not scheduled to be fully repaid until 2014. Nonetheless, the BFC determined that the KCMSD had sufficient funds in its reserves to immediately pay off the bonds. The Missouri Board of Education then certified that the KCMSD was no longer entitled to make reductions in its per-pupil payments allocated to charter schools pursuant to Section 160.415.2(5). Two months later, the legislature repealed Section 160.415.2(5), effective July 1, 2006. S.B. No. 287, 93rd Gen. Assem., 1st Reg. Sess. (Mo. 2005) ("Senate Bill 287"). As a result of the State's

---

[10]The BFC is comprised of Missouri's Governor, Lieutenant Governor, Attorney General, Auditor, Treasurer, and Commissioner of Administration. Mo. Rev. Stat. § 33.300.

-7-

actions, in July 2006, the KCMSD was forced to begin transferring the full per-pupil portion of the property tax levy funds to the charter schools.[11]

On February 22, 2006, the KCMSD, the class of plaintiff schoolchildren, and intervenor AFT filed a joint motion in the District Court asking the court to exercise ancillary jurisdiction and enforce the 1996 Agreement and court orders that incorporated the Agreement and established the terms of the State's dismissal from the case. The movants argued that the State's dismissal was premised on the maintenance of the property tax levy proceeds to allow the KCMSD to repay court-ordered desegregation bonds. According to the movants, the State violated the Agreement and court orders by enacting Section 33.315 and Senate Bill 287, which require the KCMSD to "use levy proceeds that are devoted to the repayment of the desegregation bonds to fund the charter schools." Jt. Motion to Enforce Judgments at 2. The movants asked the court to enjoin the State from "using any portion of the per-pupil amount needed for the repayment of leasehold revenue bonds obligated pursuant to this case for the funding of charter schools or any other purpose." Id.

The District Court granted the motion on June 15, 2006. The court found that "the dismissal of the State was granted subject to assurances of the existence of adequate funding for KCMSD's operations and the repayment of court-ordered desegregation bonds," including "the $320 million in transition payments" and "the availability of the entire property tax levy." Order of June 15, 2006, at 1. The court was "concerned that requiring KCMSD to transfer these funds to the charter schools will impede its ability to fund its ongoing operations and continue to meet its debt service obligation." Id. at 6. The court concluded that "consistent with the Eighth Circuit's opinion approving the dismissal of the State, the State must not alter the

---

[11]The District Court found that "the amount of § 160.415.2(5) withholding from FY 2000 to FY 2005 has been in the range of $4M to $6M per year depending on the number of charter school students and KCMSD's debt service schedule." Order of June 15, 2006, at 6.

financial status quo until KCMSD has fully repaid its court-ordered bonds." Id. at 7. In an amended order issued on November 21, 2006, the court further clarified that "the 1996 Settlement Agreement requires the State to permit KCMSD to withhold local property tax levy funds for repayment of court-ordered leasehold revenue bonds from transfer to charter schools, pursuant to Mo. Rev. Stat. § 160.415.2(5), through the respective initial retirement dates of each of the court-ordered leasehold revenue bond obligations." Am. Order of Nov. 21, 2006, at 3. The court enjoined the State from requiring the KCMSD to divert to the charter schools property tax levy funds that were traditionally withheld under Section 160.415.2(5). The State appeals this order.

II.

Before reaching the merits of the District Court's order, we must address the State's argument that the District Court had no jurisdiction to consider the motion and enjoin the State. The District Court addressed this jurisdictional issue and determined that it had ancillary jurisdiction to enforce prior orders in this case. Order of June 15, 2006, at 3 (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 379 (1994)). We review issues of subject matter jurisdiction de novo. Myers v. Richland County, 429 F.3d 740, 745 (8th Cir. 2005).

The State's argument against jurisdiction has two related prongs, both of which we reject. First, the State asserts that because the District Court declared the District unitary and closed the case in 2003, the court had no jurisdiction "to impose remedies some three years after such declaration." Br. of Appellants at 51. This argument is based on the faulty premise that the District Court imposed *new* obligations on the State. As we discuss in detail below, however, the District Court did nothing more than enforce existing obligations created by previous remedial orders in this case.[12] While a district court's jurisdiction typically ends when a case is closed and judgment

---

[12]Underlying all of the State's arguments on appeal is the theory that the District Court unlawfully placed new requirements on the State when the court granted the motion. We reject this theory at multiple points in this opinion.

entered, a district court retains ancillary jurisdiction to "manage its proceedings, vindicate its authority, and effectuate its decrees." Kokkonen, 511 U.S. at 380. The Supreme Court has recognized that "[w]ithout jurisdiction to enforce a judgment entered by a federal court, the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." Peacock v. Thomas, 516 U.S. 349, 356 (1996) (internal quotation marks and citation omitted). We affirm the District Court's determination that it had ancillary jurisdiction to enforce previous orders in this case.

This leads us to the second prong of the State's jurisdictional argument. The State asserts that the District Court did not have ancillary jurisdiction to enforce the 1996 Agreement because the 1996 Agreement was simply a settlement agreement, the terms of which were not made part of a court order. Kokkonen made clear that federal courts do not retain authority to enforce settlement agreements *unless* the dismissal order states that the district court is retaining jurisdiction over the agreement *or* the court incorporates the terms of the agreement into an order. 511 U.S. at 381. The District Court reiterated that it had approved the 1996 Agreement "as part of a modified judicial order" and noted that "[t]he Eighth Circuit has taken the view that the State was dismissed pursuant to an order of the Court modifying an earlier remedy and not pursuant to an unincorporated settlement agreement." Order of June 15, 2006, at 3 (citing Jenkins XIV, 122 F.3d at 605). The District Court thus concluded that it had ancillary jurisdiction to enforce the terms of the Agreement as incorporated into court orders. We reach the same conclusion.

The opinions of both the District Court and this Court make it clear that the 1996 Agreement was incorporated into the District Court's orders. Initially, the District Court's March 25, 1997, order approving the Agreement indicated that the District Court was modifying its earlier injunctive decrees. Jenkins v. Missouri, 959 F. Supp. at 1172. The District Court stated that it would approve the Agreement, thereby releasing the State upon the payment of transitional funding, because "[e]quity

-10-

requires a modification of the earlier remedy." Id. In a later ruling on the plaintiffs' motion to stay the order approving the Agreement, the District Court stated, "Properly understood, the approval of the agreement was a court-determination to release the State from liability over the objections of Plaintiffs—it was not a consensual settlement agreement." Jenkins v. Missouri, 965 F. Supp. 1295, 1302 n.11 (W.D. Mo. 1997). The District Court has not varied from this view. In an October 2, 1997, order discussing attorney fees, the District Court was called on to "defin[e] the nature of the Agreement and the relationship between it and the Order of March 25, 1997." Order of Oct. 2, 1997, at 5. The court stated: "The Agreement and the Order of March 25, 1997, which approved the Agreement, modified the Court's original remedial injunction." Id. The court was persuaded "to view the court-approved Agreement as a judicial decree, not a contract," id. at 7, and to "look to law governing judgments, not contract law, to interpret and implement the Agreement and the Order of March 25, 1997," id. at 7–8. The District Court concluded that "once the Court approved the Agreement, its terms transformed from a contract into a court judgment." Id. at 17.

Our Court has also taken the view that the District Court's approval of the 1996 Agreement was a modification of the District Court's earlier orders. In affirming the approval of the Agreement, we recognized the equitable power possessed by district courts to modify the remedies ordered in school desegregation cases and stated that the District Court "amended the remedy" in this case. Jenkins XIV, 122 F.3d at 603. We rejected the plaintiffs' argument that they could not be bound by the Agreement, stating that the District Court approved the Agreement as "an exercise of its continuing equitable authority to devise and implement a remedy in this case" and that the District Court's order was "not akin to a contract." Id. at 604 n.11. Finally, we noted that the court could modify the Agreement in the future to hold the State responsible for additional funding. Id. at 603.

Our review of these orders convinces us that while the District Court's March 25, 1997, order did not state explicitly that it was "incorporating the terms of

-11-

the 1996 Agreement," that is exactly what the order did. See Schaefer Fan Co. v. J & D Mfg., 265 F.3d 1282, 1287 (Fed. Cir. 2001) ("[A] district court need not use explicit language or any magic form of words to effect a valid incorporation of an agreement into an order." (Internal quotation marks and citation omitted)). The circumstances here are easily distinguishable from those in Kokkonen where the Supreme Court deemed the district court's "mere awareness and approval of the terms of the settlement agreement" insufficient to support ancillary jurisdiction. 511 U.S. at 381. Additionally, as is clear from our discussion below, this Court's approval of the State's dismissal and the declaration of unitary status came only after we were confident that the financial conditions in place at the time would provide adequate funding for the KCMSD to meet its court-ordered bond obligations. The District Court was well within its authority to exercise ancillary jurisdiction to enforce the terms of all of its prior orders (including the terms of the incorporated Agreement), as well as all of the prior orders of this Court.

III.

We proceed to consider whether the District Court, in exercising its ancillary jurisdiction, acted appropriately in enjoining the State from requiring the District to divert to charter schools the levy funds that had been dedicated to repayment of the District's outstanding court-ordered desegregation bonds. The parties disagree on the standard that we should apply in our review. The State argues that the District Court interpreted and modified a settlement agreement and that such action is subject to de novo review. See Little Rock Sch. Dist. v. N. Little Rock Sch. Dist., 451 F.3d 528, 531 (8th Cir. 2006). The movants argue that the District Court interpreted its previous orders and that such interpretation is reviewed for abuse of discretion. See Steahr v. Apfel, 151 F.3d 1124, 1126 (8th Cir. 1998) (ruling that we must defer to a district court's construction of its own remand order). Neither characterization of the District Court's actions is completely accurate, however. As discussed above and in more detail below, the District Court exercised its ancillary jurisdiction by interpreting and enforcing earlier remedial orders (including orders incorporating the Agreement) of

-12-

both the District Court (including orders authored by Judge Clark) and the Eighth Circuit. Vindicating the authority of both courts was an exercise of the District Court's inherent power. Kokkonen, 511 U.S. at 380.[13] In other contexts, we have reviewed a district court's exercise of its inherent power for abuse of discretion. See, e.g., K.C. 1986 Ltd. P'ship v. Reade Mfg., 472 F.3d 1009, 1017 (8th Cir. 2007) (reviewing district court's refusal to consider party's argument); Greiner v. City of Champlin, 152 F.3d 787, 790 (8th Cir. 1998) (reviewing district court's award of sanctions). We believe that reviewing for abuse of the district court's discretion is appropriate in the context of the exercise of ancillary jurisdiction as well.[14]

In enjoining the State from interfering with the District's use of levy proceeds previously withheld under Section 160.415.2(5) to repay court-ordered bonds, the District Court indicated that it was enforcing both court orders and the terms of the 1996 Agreement that were incorporated into court orders. Our review of the Agreement and the numerous orders in this case leads us to conclude that the District Court acted properly.

## A.

First, we find that the injunction was necessary to effectuate previous court orders. Ensuring the KCMSD's ability to repay court-ordered funding obligations was a priority for both this Court and the District Court throughout this litigation. Implicit in previous orders is a clear understanding that court-ordered remedies would be fully funded. If we look back to 1987 when the District Court first ordered the issuance of the capital improvement bonds and the property tax levy increase, we see that the

---

[13]"The cases that Kokkonen, 511 U.S. at 380, 114 S. Ct. 1673, classifies as examples of the second head of ancillary jurisdiction do not use the term ancillary jurisdiction, but refer to 'inherent' or 'implied' power . . . ." United States v. Meyer, 439 F.3d 855, 860 n.7 (8th Cir. 2006).

[14]We note, however, that our ultimate conclusion would not change were we to apply de novo review, as the District Court acted properly in all respects.

District Court specifically required "that the revenues from the property tax increase . . . be used to retire the capital improvement bonds." Order of Oct. 27, 1987, at 1. The court directed that the portion of the tax increase "that is required to pay the interest and principal of the bond indebtedness shall remain in effect until such time as the bonds are retired or until other provisions are adopted to insure their retirement." Id. at 2. Although on appeal we stated that the property tax levy should be used to fund other desegregation expenses in addition to retiring the bonds, we did not criticize the District Court's order regarding the repayment of the bonds. Jenkins II, 855 F.2d at 1315.

Ten years later, when asked to approve the Agreement between the State and the KCMSD releasing the State from the case, the courts again considered the property tax levy and the KCMSD's ability to fund its court-ordered desegregation obligations. In its order approving the Agreement, the District Court recognized that "[a]ll of the parties agree that removal of the court-ordered levy would result in 'fiscal chaos.'" Jenkins v. Missouri, 959 F. Supp. at 1154. While noting that its approval of the Agreement would leave in place the court-ordered $4.96 levy for the three-year transition period contemplated by the Agreement, the District Court warned the KCMSD that it was not the court's responsibility to ensure funding for the District and directed the KCMSD to "plan on being entirely self-sufficient [after the three-year period], even if that means regressing to a $2.75 levy." Id. at 1179. The State asks us to consider this dicta as evidence that the dismissal of the State was not contingent on the District's continued receipt of levy funds. We decline to do so, however, because the District Court's order was not the last word on the matter. In addressing two separate appeals of the District Court's order, our Court took a different approach to funding.

First, in an opinion addressing the plaintiffs' appeal of the District Court's approval of the Agreement, we stressed that funding at the "present level" was "unquestionably critical to the continuing success of the district's programs." Jenkins

XIV, 122 F.3d at 603. We stated that the continuing operation of the schools was dependent on the $4.96 levy, which the KCMSD was only able to establish because the court enjoined the enforcement of state laws that set a lower levy limit. Id. We noted, however, that the Missouri General Assembly had recently passed a joint resolution submitting for voter approval an amendment to the Missouri Constitution that would allow the KCMSD to maintain the levy at the $4.96 level, thereby providing for a means of continued funding after the District was declared unitary and no longer under court supervision. Id. Assured of the likelihood of continued funding, we affirmed the District Court's approval of the Agreement. We concluded, however, that should "the loss of the level of funding under the current levy . . . occur, it would present a changed circumstance that could call for reconsideration of the agreement." Id.

Then, in addressing the KCMSD's separate appeal of the District Court's determination that it was not the court's duty to ensure funding for the District, we again recognized the KCMSD's need for sufficient funds to make payments on the bonds. Jenkins v. Missouri, 158 F.3d 984 (8th Cir. 1998) (Jenkins XV). We found, however, that the KCMSD's concern that "it [was] on the brink of a funding crisis because it [was] uncertain whether it [would] have sufficient funds to retire the bonds" was alleviated for the time being because (after the appeal was argued) "the voters of Missouri . . . adopted a constitutional amendment that allows the board of the KCMSD to set the tax rate at an amount up to $4.95 for $100 assessed valuation." Id. at 986 (discussing amendment to Mo. Const. Art. 10 § 11(g)). Based on this constitutional amendment, we stated that "[i]t is now evident that KCMSD can raise funds to retire the [court-ordered] bonds." Id. We recounted that the documents authorizing the issuance of the bonds had declared an intent that the bonds be satisfied out of an increase in the property tax levy, and we stated that the constitutional amendment "now gives the KCMSD board authority to maintain that part of its levy *which has heretofore been devoted to retire its indebtedness*." Id. (emphasis added). Because the issue of funding was not ripe, we dismissed the appeal. Id. We noted, however,

-15-

that should state laws interfere with the adoption of a levy in the future, "the district court could enter injunctive orders to set aside enforcement of such state laws or constitutional provisions." Id. And we concluded that "[s]hould efforts be made to declare the district unitary before retirement of the [bonds], the [bond repayment] issue can appropriately be determined at that time."[15] Id. These two orders clearly indicate that we only affirmed the District Court's order approving the Agreement after we were assured that sufficient funding would remain in place to enable the KCMSD to satisfy its desegregation obligations.

After the State made its final payment to the KCMSD under the Agreement, the District Court entered an order dismissing the State from the case. Addressing the funding issue, the District Court stated, "The [funding] concerns expressed by the Eighth Circuit have been addressed and eliminated by passage of H.J.R. 9[, amending Mo. Const. Art. 10 § 11(g)], which ensures that the levy would remain at $4.95 per $100 by simple majority vote of the school board." Order of Jan. 28, 1999, at 5 n.2. While relinquishing jurisdiction over the State, the District Court also ordered the State to "continue to comply with obligations, if any, that it took during the course of this lawsuit and which are not covered by the Agreement itself." Id. at 6. The District Court concluded with a warning: "The State should be warned by its twenty-one year involvement in this case against taking any actions which might prevent the KCMSD from ultimately fulfilling its court-ordered remedial goals." Id.[16]

---

[15]While we recognize that the KCMSD did not raise the issue at that time, nothing would have prompted it to do so. The State did not restrict the funds that the KCMSD could withhold and use to repay the bonds until after the District was declared unitary.

[16]The State appears to have taken the warning to heart, as five months later it passed Section 160.415.2(5), permitting the KCMSD to reduce its payments to charter schools by the amount needed for repayment of the bonds.

These five orders paint a picture of the obligation that the District Court and this Court placed on the State to refrain from taking any action that interferes with the KCMSD's ability to retire the court-ordered bonds.  In granting the movants' recent motion, the District Court enforced this obligation by prohibiting the State from requiring the KCMSD to transfer to charter schools tax levy funds dedicated to the repayment of the bonds and traditionally withheld under Section 160.415.2(5).  The State's argument that the District Court's order somehow imposed new duties on the State is without merit.

B.

In addition to stopping the State from flouting the court orders themselves, the District Court indicated that it was enforcing the 1996 Agreement, which we have found incorporated into court orders and thus enforceable under the court's ancillary jurisdiction.  See discussion supra at 10–12.

The 1996 Agreement provided that the "purpose of the [lump-sum] payments by the State to the KCMSD is to provide the KCMSD with a source of funds not only for the next three years, but for future years."  Agreement at ¶ 5.  To effectuate that purpose, "the parties agree[d] that the KCMSD shall set aside a portion of the funds being provided by the State for use in years subsequent to fiscal year 1999."  Id.  The movants assert that pursuant to this provision, a portion of the $320 million paid by the State remains in the KCMSD's reserves.  According to the movants, the State is indirectly reclaiming funds that it transferred under the Agreement by requiring the KCMSD to divert moneys to the charter schools.  With these moneys now unavailable to make payments on the bonds, the KCMSD will be forced to deplete its reserves to service its bond obligations.  We agree with the District Court's finding that implicit in the Agreement was the parties' expectations that the State would not reclaim the funds that it was transferring under the Agreement.  The District Court's order therefore appropriately gave effect to this provision.

-17-

The District Court also considered Paragraph 8 of the Agreement, which required the parties to "jointly support existing court-ordered financing" (including the increased property tax levy) "until such time that the District is declared unitary." Agreement at ¶ 8. The court found that "had KCMSD not been declared unitary in 2003, the State would have had a continuing obligation to support KCMSD's retirement of the court-ordered bonds through the original maturity dates in 2014." Am. Order of Nov. 21, 2006, at 2–3. While the District Court recognized that this provision *per se* imposed no obligation on the State after the District was declared unitary,[17] the District Court went on to quote our 1998 opinion in which we stated, "Should efforts be made to declare the district unitary before retirement [of the bonds], the issue can appropriately be determined at that time." Jenkins XV, 158 F.3d at 986 (dismissing the KCMSD's appeal of the District Court order approving the Agreement). The District Court noted that while the KCMSD did not raise the issue of funding at the unitary status proceedings, the KCMSD would have had no reason to sound the alarm at that time because the State had not yet restricted the District's withholding under Section 160.415.2(5). "Under these circumstances," the District Court found the issue "appropriately raised at this time." Am. Order of Nov. 21, 2006, at 3. The District Court thus relied on both the Agreement and an order of this Court in finding "that the leasehold revenue bond obligations are 'court-ordered financing' and the State has a continuing obligation to support KCMSD's efforts to retire them within their respective initial maturation dates." Id. We find the District Court's opinion well reasoned and conclude that the District Court did not abuse its discretion in ordering the State not to interfere with the KCMSD's retirement of the bonds.

---

[17]The State argues that the District Court should have construed Paragraph 8 as limiting the State's obligation to support the levy. Reply Br. of Appellants at 24 (noting that the parties chose not to "set in stone the $4.96 levy for the life of the bonds"). The State fails to note that the District Court *did* recognize that the plain language of Paragraph 8 did not impose obligations on the State after the District was declared unitary.

The State asks us to consider a third provision of the Agreement that the District Court did not directly address. Paragraph 3 of the Agreement relieved the State, following its payment of $320 million, from making any further payments "to fund or otherwise provide for desegregation remedies in the KCMSD." Agreement at ¶ 3. The State argues that the District Court's order contradicted Paragraph 3 because the order imposed new funding requirements on the State. This is another argument that arises from the State's mis-characterization of the District Court's action. As we stated above, the District Court's order did not require the State to provide new funding to the District; rather, it simply enforced the State's long-standing obligation not to impede the District's ability to use levy proceeds to retire the bonds. Thus, we reject the State's argument that the District Court's order unlawfully modified the Agreement.

## IV.

The District Court acted properly in exercising ancillary jurisdiction to enforce court orders and the incorporated Agreement. We affirm the District Court's order.

_____