The **SCHOOL DISTRICT OF KANSAS CITY, MISSOURI, et al., Appellant–Respondent,**

v.

**MISSOURI BOARD OF FUND COMMISSIONERS, et al., Respondent–Appellant,**

**Missouri Charter Public School Association, et al., Respondent–Appellant,**

**Gordon Parks Elementary School, Respondent–Appellant.**

Nos. WD 74418, WD 74500, WD 74666.

Missouri Court of Appeals, Western District.

Aug. 21, 2012.

As Modified Oct. 2, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 2, 2012.

Application for Transfer Denied Dec. 18, 2012.

Allan V. Hallquist and Derek T. Teeter, Kansas City, MO, for appellant-respondent.

James R. Layton and Christopher J. Quinn, St. Louis, MO, for respondent-appellant Missouri Board of Fund Commissioners, et al.

Charles W. Hatfield, Jefferson City, MO, for respondent-appellant Missouri Charter Public School Association, et al.

David L. Heinemann, Kansas City, MO, for respondent-appellant Gordon Parks Elementary School.

Before DIV III: VICTOR C. HOWARD, Presiding Judge, JAMES E. WELSH, Chief Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

This is an appeal from the trial court's grant of summary judgment in favor of the Kansas City, Missouri School District ("School District") and against several State boards and entities and several intervenor charter schools. The trial court's Second Amended Memorandum, Order and Judgment entered October 21, 2011 ("Judgment"): (i) awarded the School District a judgment for breach of contract against the State defendants in the amount of $6,162,011; (ii) ordered a State agency to recoup money diverted to charter schools; and (iii) entered a judgment for money had and received against the intervenor charter schools in the amount of $5,082,253. The Judgment further awarded prejudgment and post-judgment interest at the rate of 9% per annum on the monetary awards. The subject matter of the Judgment is integrally interwoven with the lengthy and complex federal desegregation litigation commenced in 1977 by a class of plaintiff schoolchildren against the

School District and various State defendants (the "Desegregation Litigation").[1]

We conclude that the trial court erroneously declared and applied the law when it held that the State was foreclosed from denying that it breached a settlement agreement reached with the School District in the Desegregation Litigation. We further conclude that the trial court erroneously declared and applied the law when it entered judgment on the School District's breach of contract claim because the settlement agreement was not an independently enforceable contract. We conclude that the trial court erroneously declared and applied the law when it held that the State's Department of Elementary and Secondary Education violated the Supremacy Clause, federal court orders, and otherwise acted unreasonably, arbitrarily, capriciously, and in abuse of its discretion, in rejecting the School District's request for restoration of money transferred to the charter schools. Finally, we conclude that the trial court erroneously declared and applied the law when it entered judgment on the School District's money had and received claim because the School District cannot establish the essential element that

retention of money transferred to charter schools would be unjust, and because the uncontested facts establish that the transfer of money to charter schools was voluntary, an affirmative defense.

We reverse the Judgment and enter the judgment this court ought to give pursuant to Rule 84.14.

## Factual and Procedural History [2]

### The Parties

The plaintiff in this case is the School District.[3] The defendants are the Missouri Board of Fund Commissioners, the State of Missouri, the Missouri State Board of Education, the Department of Elementary and Secondary Education, and individually named members of the Board of Fund Commissioners and the Commissioner of Education (hereinafter collectively referred to as the "State"). The Intervenor–Defendants are the Missouri Charter Public School Association and 14 charter schools within the geographic boundaries of the School District (hereinafter collectively referred to as the "Charter Schools").[4]

---

**1.** *Jenkins v. Kansas City, Missouri School District, et al.*, Case No. 77–0420–CV–W filed in the United States District Court for the Western District of Missouri.

**2.** The facts herein summarized were not contested by the parties in their respective summary judgment pleadings.

**3.** Three individual taxpayers are also technically named as plaintiffs on the pleadings. The three taxpayer plaintiffs originally asserted a claim that Article X, Section 16 of the Missouri Constitution (the Hancock Amendment) had been violated. That claim had been abandoned before entry of the Judgment. Since the Judgment did not award relief to the three taxpayer plaintiffs, and since those plaintiffs, though reflected in the caption, had no claim for relief pending at the time of the Judgment, we disregard their

technical status as parties for purposes of this appeal.

**4.** The charter schools that intervened as defendants in this case are: Académie Lafayette, Guadalupe Centers, Inc. d/b/a Alta Vista Charter School, Benjamin Banneker Charter Academy of Technology, BSDS, Inc. d/b/a Brookside Day and Charter School, Della Lamb Community Services, Derrick Thomas Academy Charter School, Inc., Genesis School, Inc., Gordon Parks Elementary School, Scuola Vita Nuova, Sparrow Community Development Corporation d/b/a Lee A. Tolbert Community Academy, University Academy, Urban Community Leadership Academy, Westport Allen Village School, and Academy of Kansas City, Inc.

Gordon Parks Elementary School is represented by separate counsel. The balance of the charter schools and the Missouri Charter

### The Backdrop of the Desegregation Litigation [5]

In 1977, the School District, the State of Missouri, and other state agencies or representatives [6] were named as defendants in the Desegregation Litigation, initiated by a class of plaintiff schoolchildren. Years of protracted litigation resulted in a ruling by the United States District Court for the Western District of Missouri ("Federal District Court") that the School District and the State were *jointly and severally liable* for constitutionally prohibited discrimination in the School District and for the resulting costs to remediate the vestiges of discrimination. *Jenkins v. State of Missouri,* 593 F.Supp. 1485, 1505 (W.D.Mo.1984). The Federal District Court thereafter issued a joint and several injunction requiring the State and the School District to fund compensatory and educational programs and necessary capital improvements in the School District. *Jenkins v. State of Missouri,* 639 F.Supp. 19 (W.D.Mo.1985) (*aff'd as modified, Jenkins by Agyei v. State of Missouri,* 807 F.2d 657 (8th Cir.1986), *cert. denied, Jenkins v. Missouri,* 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987)). From time to time thereafter, the Federal District Court exercised its authority to modify its remedial orders (collectively "Desegregation Orders"). *See, e.g., Jenkins v. Missouri,* 672 F.Supp. 400 (W.D.Mo.1987).

The Federal District Court recognized that the School District did not have sufficient revenues to finance its share of the costs of the remedial plan, and that certain Missouri state laws in effect at that time prevented the School District from raising the necessary funds through an increased tax levy. *Jenkins,* 639 F.Supp. at 45; *Jenkins,* 672 F.Supp. at 411. The Federal District Court thus mandated a court-ordered increase in the property tax levy, and required the School District to issue leasehold revenue bonds in the total amount of $150,000,000 to be retired within 20 years from the date of issue. *Id.* at 413. The Federal District Court "earmarked the proceeds of the property tax increase for retirement of capital improvement bonds, with any excess to be used to fund other desegregation costs." *Jenkins by Agyei v. State of Missouri,* 855 F.2d 1295, 1309 (8th Cir.1988). The United States Supreme Court upheld the court-ordered property tax increase as the means by which the School District could generate revenue to pay its share of the costs of remediating discrimination. *Missouri v. Jenkins,* 495 U.S. 33, 58, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990).

In 1993, the Federal District Court authorized the School District to issue an additional $160,000,000 in leasehold revenue bonds to cover costs associated with court-ordered capital improvements. *Jenkins v. Kansas City Missouri School District,* 516 F.3d 1074, 1077 n. 6 (8th Cir.

Public School Association are represented by the same counsel.

Academy of Kansas City, Inc. is not a party to this appeal as it ceased to exist prior to the entry of the judgment that is the subject of this appeal.

5. We borrow heavily in this discussion from the Judgment, and note that the background information about the Desegregation Litigation essential to understanding the context of the matter before us is not contested by any of the parties.

6. We will refer collectively to the State related defendants named in the Desegregation Litigation as the "State," the same collective reference we are using to identify the State related defendants in the instant case. Although there is not complete identity between the State related defendants named in the Desegregation Litigation and in the instant case, any variance is immaterial to our disposition of this appeal.

2008). No other leasehold revenue bonds were issued by the School District for the purpose of remediating the vestiges of discrimination. Thus, the last of the court-ordered leasehold revenue bonds is set for redemption or final payment by 2014.

On May 21, 1996, the joint and severally liable defendants in the Desegregation Litigation, the School District and the State, entered into a settlement agreement ("Settlement Agreement" or "Agreement"). The plaintiff schoolchildren were not parties to the Settlement Agreement, and did not consent to its terms. The object of the Agreement was to end the joint and several obligations imposed on the State by the Desegregation Orders and to secure the State's dismissal from the Desegregation Litigation.

Paragraph 9 of the Settlement Agreement provided:

This Agreement is contingent upon Court approval, and, except for paragraph 10 [7] below, shall not become binding on any of the parties unless and until final court approval, as defined in subparagraph 2, is obtained.

In paragraph 2 of the Settlement Agreement, the State agreed to pay, and the School District agreed to accept, $314,000,000 paid over three years as the agreed upon amount of the State's share of the remaining cost to remediate the vestiges of discrimination. A preamble to the Agreement stated the expectation that "the State will have fulfilled its constitutional obligations with the payments set forth in this Agreement." In paragraph 2, "final court approval" was defined as "when the District Court approves the Agreement and such approval has been upheld by the appellate courts, or all ap-

peals or requests for review have been dismissed, whichever occurs earlier."

In paragraph 4, the Agreement provided that:

Upon final approval of this Agreement by the Court and the payment of all amounts set forth in paragraph 2 above, the parties agree that the State shall be entitled to a Court order (a) dissolving all outstanding injunctions against it in the Lawsuit, (b) dismissing with prejudice any and all claims, causes of action or appeals that have been made against the State or could have been made in the Lawsuit, and (c) fully relinquishing jurisdiction over the State in the Lawsuit. . . . [T]he State shall . . . be entitled to the aforesaid court order without further hearing or notice.

Paragraph 3 of the Agreement provided, in pertinent part that:

The payment by the State of the amounts set forth in paragraph 2 above shall complete the State's obligation to fund or otherwise provide for desegregation remedies in the [School District].

Finally, paragraph 8 of the Agreement provided that:

[The School District's] property tax levy is currently set at $4.96 pursuant to Court order establishing that rate as the maximum limitation on the local school property tax, and [School District] Board action setting that rate. *The parties shall jointly support existing court-ordered financing,* except for any orders requiring State financing other than the State payments set forth in the Agreement, *until such time that the [School District] is declared unitary,*

---

**7.** The content of paragraph 10 of the Settlement Agreement is not implicated by the is- sues in this case.

after action by the Court, or the voters change the rate.

(Emphasis added.)

In July, 1996, the State filed a motion seeking approval of the Settlement Agreement. The plaintiff schoolchildren opposed the motion.

After a three week contested hearing, the Federal District Court concluded "that any remaining obligation of the State to the school children of Kansas City may be discharged by the payment of the funds provided for in the Agreement." *Jenkins v. State of Missouri*, 959 F.Supp. 1151, 1153, 1172 (W.D.Mo.1997). However, the Federal District Court unilaterally increased the State's payment obligation from $314,000,000 to $320,000,000. *Id.* at 1152. The Federal District Court observed that notwithstanding the plaintiff schoolchildren's contention that the court had "no authority or jurisdiction to approve the Agreement ... the principles of a desegregation remedy require a 'practical flexibility.'" *Id.* (quoting *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)). The Federal District Court observed that " 'a sound judicial discretion *may call for the modification of the terms of an injunctive decree* if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.'" *Id.* (quoting *System Federation No. 91 v. Wright*, 364 U.S. 642, 647, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) (emphasis added)). The Federal District Court concluded that it "has 'inherent jurisdiction in the exercise of its equitable discretion and subject to appropriate appellate review to vacate or modify its injunctions.'" *Id.* (quoting *Booker v. Special School District No. 1*, 585 F.2d 347, 352 (8th Cir. 1978), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979)).

The Federal District Court then exercised this "inherent jurisdiction" to vacate or modify previously entered Desegregation Orders, holding as follows:

*Equity requires a modification of the earlier remedy* prescribed by this Court.... *The Court declares that the joint and several liability funding is therefore modified to individual liability of the [School District].* The State's obligation shall end and the State shall be entitled to an Order from this Court dismissing the State from this action when the State has paid the sums provided for in this Agreement.

*Id.* (emphasis added) (hereinafter "Approval Order").

The Eighth Circuit Court of Appeals affirmed the Approval Order. *Jenkins by Jenkins v. State of Missouri*, 122 F.3d 588, 605 (8th Cir.1997). It held:

The issue of whether the district court erred in approving the [Agreement] is a close one. Nevertheless, we cannot say that the district court clearly erred in its factual findings regarding the [Agreement], nor that it abused its discretion in approving the [Agreement] and, *in effect, modifying the earlier remedy ordered by the court.*

*Id.* (emphasis added). However, the Eighth Circuit cautioned:

Sufficient funding is absolutely essential to the [School District's] continued viability. All parties agree that the loss of the level of funding under the current levy would be catastrophic and would reduce the [School District's] funding to less than half the amount that has been available to the [School District] for a number of years. *Should this loss of funding occur, it would present a changed circumstance that could call for reconsideration of the [Agreement].*

*Id.* at 603 (emphasis added). In rejecting the plaintiff schoolchildren's assertion that

the Approval Order bound them to a contract to which they were not parties, the Eighth Circuit held:

> The Class analogizes the [Agreement] to a contract and contends that it cannot be bound by a contract to which it is not a party. *Regardless of the [Agreement,] the [Approval Order] is not akin to a contract* .... [The Class's additional] arguments must fail based on our holding that the [Federal District Court's] *approval of the [Agreement] was an exercise of its continuing equitable authority to devise and implement a remedy in this case.*[8]

*Id.* at 604 n. 11 (emphasis added).

The State completed its $320 million payment obligation to the School District, as had been modified by the Federal District Court, on December 3, 1998. The Federal District Court thereafter entered an order dated January 28, 1999 ("Dismissal Order") stating:

> In accordance with the Agreement and with the Court Orders approving that Agreement, the State Defendants are entitled to relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(5), full and final dismissal with prejudice from [the Desegregation Litigation], dissolution of all outstanding injunctive orders against them, and relinquishment from jurisdiction over them with regard to this case.

Importantly, the Dismissal Order stated the following:

> The Court hereby enters an Order dismissing the State from this lawsuit.

The Court's Order, however, does not reach beyond the scope of the parties' Agreement. The State *must continue to comply with obligations, if any, that it undertook during the course of this lawsuit and which are not covered by the Agreement itself.* ... The State should be warned by its twenty-one year involvement in this case against taking any actions which might prevent the [School District] from ultimately fulfilling its court-ordered remedial goals.

The Dismissal Order then ordered that "the State Defendants are hereby relieved from the judgment in this case and all outstanding judgments against them are dissolved. The State Defendants are dismissed, with prejudice, and the Court relinquishes jurisdiction over them with respect to this case."

■ On August 13, 2003, the School District's motion requesting full unitary status[9] was granted by the Federal District Court. Paragraph 8 of the Agreement had required the State to support existing court-ordered financing "until such time that the [School District] is declared unitary."

### The State's Actions after the School District Attained Unitary Status

In April 2004, the Missouri Legislature enacted section 33.315[10] which provides:

> The board of fund commissioners shall determine whether any governmental entity has sufficient fund balances to redeem leasehold bonds obligated under a federal desegregation action. If the

---

**8.** As we discuss, *infra,* this equitable authority belonged exclusively to the Federal District Court.

**9.** Unitary status represents judicial determination that a school district has eliminated the vestiges of prior discrimination to the extent practicable. *See Board of Educ. of*

*Oklahoma City Public Schools, Independent School Dist. No. 89, Oklahoma County, Oklahoma v. Dowell,* 498 U.S. 237, 250, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

**10.** All statutory references are to RSMo 2000 (as supplemented) unless otherwise noted.

board of fund commissioners determines that any governmental entity has sufficient fund balances to redeem or otherwise pay off such leasehold bonds, the state board of education shall certify, under subdivision (5) of subsection 2 of section 160.415, RSMo, that no amount is needed by such governmental entity to repay such bonds.

Section 160.415 is a part of Missouri's Charter Schools Act, Section 160.400–160.420, adopted in 1998. Section 160.415 addresses the distribution of state school aid to charter schools. Essentially, the section requires the property tax levies collected by a public school district to be divided with charter schools in an amount proportional to the number of students attending a charter school who would otherwise have attended the public school.

Before section 33.315 was adopted in 2004, section 160.415.2(5) [11] provided that:

> The per-pupil amount paid by a school district to a charter school shall be reduced by the amount per pupil determined by the state board of education to be needed by the district in the current year for repayment of leasehold revenue bonds pursuant to a federal court desegregation action.

Thus, prior to the adoption of section 33.315, the School District was permitted to withhold from collected property taxes it would otherwise be required to transfer to charter schools the amount needed to service court-ordered leasehold revenue bonds. The adoption of section 33.315 negated the School District's ability to withhold funds from charter schools pursuant to section 160.415.2(5) if the School District was determined to have reserves sufficient to redeem or otherwise pay off court-ordered leasehold revenue bonds.

After section 33.315 was adopted, the Missouri Board of Fund Commissioners passed a motion determining that the School District had sufficient funds in reserve to redeem its leasehold revenue bonds. On April 22, 2005, the Missouri Board of Education met to consider the Board of Fund Commissioners' motion. The Board of Education concluded it was obligated to accept the Board of Fund Commissioners' determination. As a result, the Board of Education advised the School District that it could no longer rely on section 160.415.2(5) to withhold monies from charter schools necessary to service court-ordered leasehold revenue bonds. Though the School District disagreed with this conclusion, it nonetheless abided by it, and began transferring funds to charter schools it would otherwise have withheld pursuant to section 160.415.2(5).

### The School District's Response

The School District believed that section 33.315 violated the Settlement Agreement and the Approval and Dismissal Orders. The School District complained that its reserves were largely made up of the money that had been paid by the State as its share of the remaining costs to remediate the vestiges of discrimination. In contrast, the School District argued that the court-ordered property tax levy represented the School District's primary source of revenue to pay its share of the costs to remediate the vestiges of discrimination. According to the School District, the operation of section 33.315 required the School District to use the State's settlement money (i.e. the amount in the School District's reserves) to cover its share of the costs to remediate, thus indirectly reducing the State's joint and several obligation to remediate.

11. Section 160.415.2(5) was repealed effective July 1, 2006.

The School District filed suit against the State on May 10, 2005 in the Circuit Court of Cole County (the "State Court Action"). The Charter Schools intervened in or about June of 2005. One of the claims asserted by the School District was a request for a declaratory judgment "regarding whether application of section 33.315 violates the court-approved [Settlement Agreement] and other federal court orders." On July 22, 2005, the trial court dismissed this count, having advised the parties that it questioned its authority to entertain a claim for breach of the Settlement Agreement when that Agreement had required Federal District Court approval. The balance of the State Court Action remained pending.

After the trial court dismissed the School District's claim seeking a declaration that section 33.315 violated "the court-approved [Settlement Agreement] and other federal court orders," the School District filed a Joint [12] Motion to Enforce Judgments in the Desegregation Litigation in February 2006 ("Enforcement Motion"). The Charter Schools' requests to intervene in the Federal District Court proceedings were denied.

In the Enforcement Motion, the School District asserted the following:

In 1997, this Court approved an agreement among the State, [and] the [School District] ... that was objected to by the Plaintiff schoolchildren [in the Desegregation Litigation]....

*Since all of the parties did not agree to this "settlement," the Court approved the agreement as a modification of its orders, invoking its authority to amend "the terms of an injunctive decree if the circumstances, whether of law or fact, obtained at the time of its issuance*

*have changed, or new ones have since arisen."*

In analyzing [the Federal District Court's] modification of its remedial orders based on the agreement between the [School District] and the State, *the Eighth Circuit emphasized that the absence of the continued "level of funding under the current levy ... would represent a changed circumstance that could call for reconsideration of the agreement."* On this condition, the Eighth Circuit indicated that it would affirm this Court's approval of the [Agreement] ... as "an exercise of [the Federal District Court's] continuing equitable authority to devise and implement a remedy in this case."

(Emphasis added, internal citations omitted.)

Having alleged this groundwork, the School District argued in its Enforcement Motion that the Federal District Court had "ancillary jurisdiction to enforce its orders approving the agreement between the defendants in this case and setting forth the conditions of the State's dismissal." Specifically, the School District asserted that:

The [Federal District Court] not only incorporated the [Settlement Agreement] ... into its [orders approving the Settlement Agreement] (over Plaintiffs' objections) *but also specified further conditions that were necessary to its approval and to the subsequent dismissal* of the State....

Rejecting the class of Plaintiff schoolchildren's objections to the State's release from joint and several liability upon payment of $320 million, the Eighth Circuit observed:

"The class analogizes the agreement to a contract and contends that it cannot be bound by a contract to which it is not a

12. The plaintiffs in the Desegregation Litiga- tion joined in the motion.

party. *Regardless of the agreement, the [Federal District Court's] order is not akin to a contract.* The Class presented its objections to the [Federal District Court], those objections were overruled, and the Class is now bound by that order to the same extent as any other order in this case."

*Indeed, this Court itself later expressly stated that it had approved the [Settlement Agreement] as part of a modified judicial order rather than mere acceptance of a settlement agreement.* . . . The [Federal District Court] described the modification of its "original remedial injunction" as *"similar to a consent decree,"* which it defined as *"a negotiated settlement of a case enforced through the court's inherent power to enforce its own equitable decrees or orders."* . . . In particular, the [Federal District Court] emphasized that the modification occurred "after an adjudication on the merits," that it was entered without Plaintiffs' consent, and that "satisfaction of the terms of the [Settlement Agreement] [would] not necessarily end the case or the State's liability." . . . *In light of these circumstances, the [Federal District Court] interpreted the "court-approved agreement as a judicial decree, not a contract."*

(Emphasis added, internal citations omitted.) Consistent with these assertions, the School District observed in its Enforcement Motion that *"the [Settlement Agreement] could not be approved without its modification and incorporation in an order because one of the parties [the plaintiffs in the Desegregation Litigation] objected to it."* (Emphasis added.)

On June 15, 2006, the Federal District Court granted the School District's Enforcement Motion ("June 15, 2006 Order"). The June 15, 2006 Order acknowledged the

State's position that the School District had failed to "allege a breach of any specific provision of the Settlement Agreement" or "point to any specific order of this Court which the State of Missouri has violated." The Federal District Court also acknowledged, however, the School District's position that section 33.315 (and the intervening repeal of section 160.415.2(5) effective July 1, 2006) interfered with the School District's "ability to satisfy its court-ordered obligations." The Federal District Court found that the School District had adequately stated a claim for relief because the Eighth Circuit had observed that *notwithstanding the specific terms of the Settlement Agreement,* the "[School District's] *loss of the property tax levy would constitute a changed circumstance justifying reconsideration of the terms* of the [State's] dismissal." (citing *Jenkins,* 122 F.3d at 603) (emphasis added). After significant discussion, the Federal District Court found:

> Under these circumstances, the Court has little difficulty finding that the *financial conditions have changed from the time the State was granted dismissal from this case.* Accordingly, consistent with the Eighth Circuit's opinion approving the dismissal of the State, the State must not alter the financial status quo until [the School District] has fully repaid its court-ordered bonds.

(Emphasis added.)

The June 15, 2006 Order enjoined the State from requiring the School District to "divert funds" from the property tax levy "to the charter schools until 2014 or until [the School District] has completed repayment of the court-ordered desegregation bonds, whichever first occurs. This applies prospectively and retroactively to any funds excepted under section 160.415.2(5) between 1999 and 2005."

An amended order was issued by the Federal District Court on November 21, 2006 ("November 21, 2006 Amended Order"). *Jenkins v. School Dist. of Kansas City, Missouri,* 2006 WL 3386563 (W.D.Mo. November 21, 2006). In the November 21, 2006 Amended Order, the Federal District Court acknowledged that in the Settlement Agreement, "the State explicitly agreed to 'support existing court-ordered financing ... until such time that the [School District] is declared unitary.' " *Id.* *1. The court then framed the question before it as "whether the State was required to permit [the School District] to withhold funds beyond that date." *Id.* The Federal District Court concluded:

> There can be no dispute that the [leasehold revenue] bonds were "court-ordered financing" and that had [the School District] not been declared unitary in 2003, the State would have had a continuing obligation [under paragraph 8 of the Settlement Agreement] to support [the School District's] retirement of the court-ordered bonds through the original maturity dates in 2014. However, in 1998, the Eighth Circuit directed that "[s]hould efforts be made to declare the [School District] unitary before retirement [of the leasehold revenue bonds], the issue can appropriately be determined at that time." As the State has noted [the School District] did not raise the issue at that time. On the other hand the State did not restrict funds withheld under section 160.415.2(5) until after [the School District] was declared unitary. Under these circumstances, the Court finds the issue is appropriately raised at this time.

*Id.* at *2 (internal citations omitted). The Federal District Court thus held:

> Accordingly, the Court hereby ORDERS that the 1996 Settlement Agreement requires the State to permit [the School District] to withhold local property tax levy funds for repayment of court-ordered leasehold revenue bonds from transfer to the charter schools, pursuant to Mo. Rev Stat. section 160.415.2(5), through the respective initial retirement dates of each of the court-ordered leasehold revenue bond obligations.

*Id.*

The State appealed the June 15, 2006 Order and the November 21, 2006 Amended Order to the Eighth Circuit Court of Appeals. *Jenkins v. Kansas City Missouri School Dist.,* 516 F.3d 1074 (8th Cir. 2008). The Eighth Circuit affirmed. It's reasoning is highly pertinent to the resolution of this case, and is set forth below, despite its length:

> [A] district court retains ancillary jurisdiction to "manage its proceedings, vindicate its authority, and effectuate its decrees." The Supreme Court has recognized that "[w]ithout jurisdiction to enforce a judgment entered by a federal court, the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." *We affirm the District Court's determination that it had ancillary jurisdiction to enforce previous orders in this case.*
>
> ... The State asserts that the District Court did not have ancillary jurisdiction to enforce the [Settlement Agreement] because the [Agreement] was simply a settlement agreement, the terms of which were not made part of a court order.... *[F]ederal courts do not retain authority to enforce settlement agreements unless the dismissal order states that the district court is retaining jurisdiction over the agreement or the court incorporates the terms of the agreement into an order.* The District Court reiterated that it had *approved the [Settlement Agreement] "as part*

*of a modified judicial order* " and noted that "[t]he Eighth Circuit has taken the view that *the State was dismissed pursuant to an order of the Court modifying an earlier remedy and not pursuant to an unincorporated settlement agreement.*" *The District Court thus concluded that it had ancillary jurisdiction to enforce the terms of the Agreement as incorporated into court orders.* We reach the same conclusion. The opinions of both the District Court and this Court make it clear that the [Settlement Agreement] was incorporated into the District Court's orders. Initially, the [Approval Order] approving the Agreement indicated that the District Court was *modifying earlier injunctive decrees.* The District Court stated that it would approve the Agreement, thereby releasing the State upon the payment of transitional funding, because "[e]quity requires a modification of the earlier remedy." In a later ruling on the plaintiffs' motion to stay the order approving the Agreement, the District Court stated, *"Properly understood, the approval of the [Agreement] was a court-determination to release the State from liability over the objections of Plaintiffs—it was not a consensual settlement agreement."* The District Court has not varied from this view. In an October 2, 1997, order discussing attorney fees, the District Court was called on to "defin[e] the nature of the Agreement and the relationship between it and the [Approval Order]." The court stated: *"The Agreement and the [Approval Order], which approved the Agreement, modified the Court's original remedial injunction."* The court was persuaded to *"view the court-approved Agreement as a judicial decree, not a contract,"* and to "look to law governing judgments, not contract law, to interpret and implement the

Agreement and the [Approval Order]." The District Court concluded that *"once the Court approved the Agreement, its terms transformed from a contract to a court judgment."*

Our Court has also taken the view that the District Court's approval of the [Settlement Agreement] was a modification of the District Court's earlier orders. In affirming the approval of the Agreement, we recognized *the equitable power possessed by district courts to modify the remedies ordered* in school desegregation cases and stated that the District Court *"amended the remedy"* in this case. We rejected the plaintiffs' argument that they could not be bound by the Agreement, stating that the District Court approved the Agreement as "an *exercise of its continuing equitable authority to devise and implement a remedy* in this case" and that *the District Court's order was "not akin to a contract."* Finally, we noted that the *District Court could modify the Agreement in the future* to hold the State responsible for additional funding.

Our review of these orders convinces us that while the [Approval Order] did not state explicitly that it was "incorporating the terms of the ·[Settlement Agreement]," that is exactly what the· order did. The circumstances here are easily distinguishable from those ... where the Supreme Court deemed the district court's "mere awareness and approval of the terms of the settlement agreement" insufficient to support ancillary jurisdiction.... *The District Court was well within its authority to exercise ancillary jurisdiction to enforce the terms of all of its prior orders (including the terms of the incorporated Agreement), as well as all of the prior orders of this Court.*

*Jenkins,* 516 F.3d at 1080–82 (emphasis added) (internal citations omitted). After this lengthy discussion, the Eighth Circuit concluded that the June 15, 2006 Order as amended by the November 21, 2006 Amended Order *"was necessary to effectuate previous court orders." Id.* at 1083. The Eighth Circuit also found that "implicit in the Agreement was the parties' expectations that the State would not reclaim the funds that it was transferring under the Agreement. The District Court's order therefore appropriately gave effect to this provision." *Id.* at 1085.

With respect to paragraph 8 of the Settlement Agreement, the Eighth Circuit acknowledged that as written, the paragraph obligated the State to "support existing court-ordered financing . . . until such time that the [School District] is declared unitary." *Id.* The Eighth Circuit acknowledged that "this provision *per se* imposed no obligation on the State after the [School District] was declared unitary." *Id.* at 1086. The Eighth Circuit pointed out, however, that the courts and the School District had anticipated that it might be necessary to address what should occur if the School District became eligible for unitary status before the leasehold revenue bonds were paid. *Id.* Because this open issue was not raised by the School District, however, during the 2003 process to declare the district unitary, the Eighth Circuit agreed that it was appropriate to address the issue "at this time." *Id.* The Eighth Circuit thus concluded that the Federal District Court "relied on both the

Agreement *and* an order of this Court in finding 'that the leasehold revenue bond obligations · are 'court-ordered financing' and the State has a continuing obligation to support [the School District's] efforts to retire them within their respective initial maturation dates.' *Jenkins,* 158 F.3d at 986." *Id.* (emphasis added).

■ On October 16, 2006, just before the State filed its appeal to the Eighth Circuit Court of Appeals, the School District filed a Motion to Enforce Judgment Issued on June 15, 2006. The School District requested the Federal District Court "to order the State of Missouri . . . to fully comply with the Court's June 15, 2006 Order and return to [the School District] . . . $6,428,438.00 that from April 2005[to] June 2006 were diverted by the State from [the School District] to pay for charter schools." [13] In its Motion the School District stated:

As has long been recognized in this case, because the [Federal District Court's] Orders are enforcing a desegregation remedy the State has no Eleventh Amendment defense [14] for its refusal to comply with the [Federal District Court's] command.

On January 31, 2007, the Federal District Court issued an order denying the School District's Motion ("January 31, 2007 Order"). The January 31, 2007 Order held:

The June 15, 2006 Order adequately protects [the School District's] ability to

---

13. We hereinafter refer to the amount paid by the School District to charter schools from April 2005 to June 2006 as the "Diverted Withhold." Though characterized in this motion as diverted by the State, in fact, the School District transferred the Diverted Withhold to charter schools after the Board of Education advised the School District that it could no longer rely on section 160.415.2(5) to withhold from the charter schools sums the

School District believed it needed to service the leasehold revenue bonds.

14. The Eleventh Amendment to the United States Constitution prohibits federal courts from exercising jurisdiction over claims seeking damages against the State for breach of contract. *Dover Elevator Co. v. Ark. State Univ.,* 64 F.3d 442, 446–47 (8th Cir.1995).

continue payments on its Court-ordered bonds through 2014, and *equity does not require the State to reimburse [the School District] for the funds transferred to the charter schools from April 2005 through June 2006.*

(Emphasis added.) The School District appealed this order to the Eighth Circuit, but thereafter dismissed its appeal.

The School District then filed a request with the Department of Elementary and Secondary Education ("DESE") claiming the School District had "overpaid" charter schools between April 2005 and June 2006 (the time period during which section 33.315 operated to reduce the amount of the School District's withhold). The School District asked DESE to reduce payments to charter schools over the next twelve months pursuant to section 160.415.5 in order to repay the "overpayment" (the Diverted Withhold) to the School District. DESE denied this request.

### The Still Pending State Court Action

During the aforesaid Federal Court proceedings, the State Court Action remained pending. On October 20, 2006, the State Court Action was "administratively closed pending further order." The State Court Action remained administratively closed until February 2008 when the Eighth Circuit affirmed the June 15, 2006 Order as amended by the November 21, 2006 Amended Order. *Jenkins,* 516 F.3d at 1086.

### The Cross–Motions for Summary Judgment in the State Court Action

In September 2009, the School District secured leave to file a Third Amended Petition against the State. Cross motions for summary judgment were filed by the parties in February 2010, and argued on April 20, 2010. A Second Amended Cross–Claim was filed by the School District against the Charter Schools in May 2010.

At the time the cross motions for summary judgment were under advisement, the following claims were pending:

The School District's claim for a declaratory judgment and other equitable relief against the State (Count I in the School District's Third Amended Petition) [15]

The School District's claim for breach of contract against the State (Count II in the School District's Third Amended Petition)

The School District's claim seeking judicial review of an administrative action by DESE (Count III of the Third Amended Petition) [16]

The School District's claim against the Charter Schools for money had and received (Count I in the School District's Second Amended Cross–Claim) [17]

The School District sought a monetary judgment from the State and the Charter Schools in the amount of the Diverted Withhold, the same monetary recovery denied the School District by the January 31, 2007 Order.

15. This claim sought a declaration that "application of section 33.315 violates the court-approved settlement agreement and other federal court orders," and sought equitable relief ordering repayment of the Diverted Withhold. This was the same claim that had previously been dismissed by the trial court because of the trial court's concern that it had no authority to entertain such a claim.

16. This claim was added in the Third Amended Petition.

17. This claim was first inadvertently asserted by the School District against less than all of the Charter Schools. The unnamed Charter Schools were added as cross-claim defendants in the Second Amended Cross–Claim.

The trial court entered summary judgment in favor of the School District and against the State on Count II for breach of contract. The trial court concluded that "the [Federal District Court] and the Eighth Circuit have already held that the State's forced diversion of [the School District's] local tax revenues to charter schools pursuant to [section 33.315] violated the Settlement Agreement." The trial court thus concluded that the State was collaterally estopped to deny that it had breached the Settlement Agreement. The trial court also concluded that the School District was not estopped by the January 31, 2007 Order from seeking a money judgment from the State for breach of contract.

The trial court entered summary judgment in favor of the School District and against DESE on Count III which sought judicial review of DESE's administrative decision denying the School District's request that it restore the Diverted Withhold. The trial court ruled that because the Diverted Withhold pursuant to section 33.315 violated Federal District Court orders, DESE was required to restore the Diverted Withhold under section 160.415.5.

The trial court entered summary judgment in favor of the School District and against the Charter Schools on Count I of its Second Amended Cross–Claim for money had and received. The trial court concluded that the School District was not collaterally estopped to recover the Diverted Withhold from the Charter Schools by the January 31, 2007 Order because the Charter Schools were not parties to the Desegregation Litigation.

Finally, the trial court denied as moot the State's request for summary judgment on Count I seeking a declaratory judgment, and denied the State's and the Charter Schools' cross-motions for summary judgment as to all of the School District's claims and cross-claims.

The Judgment entered a monetary judgment in favor of the School District and against the State on Count II for breach of contract in the amount of $6,162,011.00, and required the payment of prejudgment interest on this sum from and after the date of the June 15, 2006 Order at the rate of 9% per annum for a total as of the date of the Judgment of $9,130,918.60. With respect to Count III, the Judgment ordered DESE to restore the $6,162,011.00 Diverted Withhold to the School District by recouping same from charter schools which received the funds (which included, but was not limited to the Charter Schools). The Judgment afforded DESE a year to recoup this money from the charter schools "pursuant to the mechanism in Mo.Rev.Stat. section 160.415.5."

The Judgment entered a monetary judgment in favor of the School District and against the Charter Schools on the money had and received claim in the amount of $5,082,253.00 [18] plus pre-judgment interest at the rate of 9% per annum from and after February 11, 2010 [19] for a total as of the date of the Judgment of $5,855,451.65. This judgment was proportionally levied against each of the Charter Schools in the amount of the Diverted Withhold each received.

The Judgment awarded post-judgment interest at the rate of 9% per annum on

18. The difference between this sum and the principal sum awarded the School District against the State was due to the fact that some of the charter schools who received portions of the Diverted Withhold were not parties to the State Court Action.

19. This was the date the "demand" for repayment was determined to have been made by the trial court.

the monetary judgments against the State and the Charter Schools. Because the School District was only entitled to one satisfaction, the Judgment directed that the School District could not pursue collection against the Charter Schools for one year to permit the School District the opportunity to recover its monetary judgment against the State during that time. The Judgment directed that the one year period would commence when the Judgment was final and all appeals exhausted.

The State and the Charter Schools appealed.[20]

### Standard of Review

"We review a trial court's decision to grant a summary judgment motion *de novo*." *C–H Bldg. Assocs., LLC v. Duffey*, 309 S.W.3d 897, 899 (Mo.App. W.D.2010). The burden is on the movant to show a right to judgment based on facts about which there is no genuine dispute. *ITT Commercial Fin. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 378, 382 (Mo. banc 1993). We view the record and reasonable inferences therefrom in the light most favorable to the non-movant. *C–H Bldg.*, 309 S.W.3d at 899 (citing *ITT Commercial*, 854 S.W.2d 371 at 376). The propriety of summary judgment is purely a question of law and we need not defer to the trial court's decision to grant summary judgment. *ITT Commercial*, 854 S.W.2d at 376. If, as a matter of law, summary judgment is sustainable on any theory, even one entirely different from that addressed by the trial court, it should be sustained on appeal. *Bolivar Insulation Co. v. Bella Pointe Dev., L.L.C.*, 166 S.W.3d 610, 614 (Mo.App. S.D.2005).

The grant of a summary judgment is appealable, but only if the judgment disposes of all the parties and all of the issues. *Gunter v. City of St. James*, 91 S.W.3d 724, 726–27 (Mo.App. S.D.2002). "Generally, the denial of a summary judgment is not a final order and, therefore, is not appealable." *Estate of Downs v. Bugg*, 242 S.W.3d 729, 732 (Mo.App. W.D.2007) (citing *Penn–Am. Ins. Co. v. The Bar, Inc.*, 201 S.W.3d 91, 96 (Mo.App. W.D.2006)). However, the denial of a motion for summary judgment may be reviewed when its merits are completely intertwined with a grant of summary judgment to the opposing party. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456 n. 1 (Mo. banc 2006). "We may direct in this posture, if proper, the judgment that the court should have entered." *Transatlantic Ltd. v. Salva*, 71 S.W.3d 670, 676 (Mo.App. W.D.2002). *See* Rule 84.14; *Redpath v. Mo. Highway & Transp. Comm'n*, 14 S.W.3d 34, 41 (Mo.App. W.D. 1999).

### Analysis

The State asserts five points on appeal. The Charter Schools (other than Gordon Parks Elementary School) assert six points on appeal. Gordon Parks Elementary School asserts four points on appeal. We will begin our discussion with the points on appeal raised by the State.

#### The State's Points on Appeal

The State asserts five points on appeal. In Point Relied On One, the State alleges that the trial court erred in granting summary judgment in favor of the School District and in denying the State's motion for summary judgment on Count II (the breach of contract claim) because the State

---

20. The Charter Schools initially filed their appeals with the Missouri Supreme Court. Their appeals were transferred to this Court by the Missouri Supreme Court. The separate appeals filed by the State, by the Charter Schools (other than Gordon Parks Elementary School), and by Gordon Parks Elementary School have been consolidated in this Court.

did not breach the Settlement Agreement, and under the plain language of the Agreement, had no obligation to support court-ordered financing after the School District was declared unitary in 2003. In Point Relied On Two, the State alleges that the trial court erred in granting summary judgment in favor of the School District on Count II (the breach of contract claim) because the State was not collaterally estopped from denying a breach of contract. In Point Relied On Three, the State alleges that the trial court erred in denying the State's motion for summary judgment on Count I (the declaratory judgment count) because the School District was collaterally estopped to seek reimbursement of the Diverted Withhold by the January 31, 2007 Order. In Point Relied On Four, the State alleges that the trial court erred in entering a money judgment against the State because the State did not breach a contract and has not waived sovereign immunity as to suits seeking damages for expenditures required by law. Finally, in Point Relied On Five, the State alleges that the trial court erred in granting summary judgment in favor of the School District on Count III (review of administrative claim) because the administrative decision by DESE was required by Missouri statute and did not violate any federal court order.

The State's points on appeal generally address two subjects: (1) the award of monetary relief against the State on the theory of breach of contract (Points One through Four); and (2) DESE's obligation to recoup the Diverted Withhold (Point Five). We address the points accordingly.

*(a) The State's Points One through Four*

In entering judgment against the State for breach of contract, the trial court did not independently determine that the State failed to perform a specific provision of the Settlement Agreement. Instead, the trial court concluded that "it is clear that the [Federal District Court] and the Eighth Circuit have already held that the State's forced diversion of [the School District's] local tax revenues to charter schools pursuant to [section] 33.315 violated the Settlement Agreement." Judgment, p. 19. The trial court then held that the State was barred:

> [F]rom relitigating three previous holdings of the [Federal District Court] and Eighth Circuit; namely: (1) that the Settlement Agreement prohibited the State from interfering with [the School District's] use of local tax revenues to pay off the desegregation bonds; (2) that the Settlement Agreement prohibited the State from indirectly reclaiming any part of the $314 million in lump-sum payments; and (3) that the State's conduct in forcing [the School District] to transfer to charter schools local tax revenues previously dedicated to payment of desegregation bonds violated the State's obligations under the Settlement Agreement.

The trial court's entry of summary judgment on the breach of contract claim thus relied exclusively on the trial court's interpretation of Federal District Court Orders and Eighth Circuit Opinions, and on the trial court's conclusion that its interpretation of said Orders and Opinions had a claim and/or an issue preclusive effect on the School District's ability to defend the breach of contract claim.

The School District and the State expend significant energy debating the interpretation of the Federal District Court Orders and Eighth Circuit Opinions. In arguing that the federal courts conclusively found the State to have breached the Settlement Agreement, the School District emphasizes language in the November 21, 2006 Amended Order:

Accordingly, the Court hereby ORDERS that the 1996 Settlement Agreement requires the State to permit [the School District] to withhold local property tax levy funds for repayment of court-ordered leasehold revenue bonds from transfer to charter schools, pursuant to Mo.Rev.Stat. Section 160.415.2(5), through the respective initial retirement dates of each of the court-ordered leasehold bond obligations.

The Judgment similarly relied on this language.

However, our review of the Federal District Court Orders and Eighth Circuit Opinions lends support for the conclusion that the Settlement Agreement failed to anticipate or address what should happen if the School District achieved unitary status *before* the court-ordered leasehold revenue bonds were repaid in 2014, and that as a result, the Federal District Court exercised its inherent authority to enter remedial orders to address this "changed circumstances."

For example, when the Eighth Circuit affirmed the Approval Order, it cautioned:

All parties agree that the loss of the level of funding under the current levy would be catastrophic and would reduce the [School District's] funding to less than half the amount that has been available to the [School District] for a number of years. *Should this loss of funding occur, it would present a changed circumstance that could call for reconsideration of the [Agreement].*

*Jenkins,* 122 F.3d at 603 (emphasis added). When the Federal District Court entered the Dismissal Order, it cautioned:

The Court's Order ... does not reach beyond the scope of the parties' Agreement. The State *must continue to comply with obligations, if any, that it undertook during the course of this lawsuit and which are not covered by the Agreement itself*.... The State should be warned by its twenty-one year involvement in this case against taking any actions which might prevent the [School District] from ultimately fulfilling its court-ordered remedial goals.

(Emphasis added.) In the June 15, 2006 Order, the Federal District Court found:

Under these circumstances, the Court has little difficulty finding that the *financial conditions have changed from the time the State was granted dismissal from this case.* Accordingly, consistent with the Eighth Circuit's opinion approving the dismissal of the State, the State must not alter the financial status quo until [the School District] has fully repaid its court-ordered bonds.

In the November 21, 2006 Amended Order, the Federal District Court observed:

There can be no dispute that the [leasehold revenue] bonds were "court-ordered financing" and that had [the School District] not been declared unitary in 2003, the State would have had a continuing obligation [under paragraph 8 of the Settlement Agreement] to support [the School District's] retirement of the court-ordered bonds through the original maturity dates in 2014. However, in 1998, the Eighth Circuit directed that "[s]hould efforts be made to declare the [School District] unitary before retirement [of the leasehold revenue bonds], the issue can appropriately be determined at that time." As the State has noted [the School District] did not raise the issue at that time. On the other hand the State did not restrict funds withheld under section 160.415.2(5) until after [the School District] was declared unitary. Under these circumstances, the Court finds the issue is appropriately raised at this time.

In upholding the June 15, 2006 Order and the November 21, 2006 Amended Order, the Eighth Circuit recalled that when it affirmed the Approval Order, it had:

> [N]oted that the **District Court could modify the Agreement in the future** to hold the State responsible for additional funding.

*Jenkins,* 516 F.3d at 1082 (emphasis added).

In light of these findings, we have a difficult time accepting the trial court's construction of the Federal District Court Orders and Eighth Circuit Opinions as having absolutely and conclusively "found" that the State breached a specific, express provision of the Settlement Agreement. It seems far more likely that the federal courts collectively concluded that " 'sound judicial discretion *may call for the modification of the terms of an injunctive decree* if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.' " *Jenkins,* 959 F.Supp. at 1172 (quoting *System Federation No. 91,* 364 U.S. at 647, 81 S.Ct. 368 (emphasis added)).

If the only issue before us was whether the trial court erroneously granted the School District's motion for summary judgment in reliance on suspect interpretations of federal court orders and opinions, we would reverse the entry of judgment on the breach of contract claim and remand this matter for an independent determination about whether the Settlement Agreement was breached. However, a cross motion for summary judgment was filed by the State on the breach of contract claim. The State has appealed the trial court's denial of its cross motion for summary judgment. The subject matter of the denied cross motion for summary judgment was intertwined with the School District's motion for summary judgment. We are authorized, therefore, to determine whether the trial court erroneously denied the cross motion for summary judgment. *Dhyne,* 188 S.W.3d at 456 n. 1.

■ The debate about whether the Federal District Court and/or the Eighth Circuit "found" that the State breached the Settlement Agreement belies a far more fundamental and dispositive concern. Regardless how the Federal District Court Orders and the Eighth Circuit Opinions are interpreted, the Settlement Agreement was not an independently enforceable contract.

The Federal District Court and the Eighth Circuit unequivocally characterized the Settlement Agreement as "not akin to a contract," and "as a judicial decree, not a contract." *Jenkins,* 516 F.3d at 1080–82. The Eighth Circuit held that "once the [Federal District Court] approved the Agreement, its terms transformed from a contract to a court judgment." *Jenkins,* 516 F.3d at 1080–82. The School District admitted that the Settlement Agreement lost its independent identity as a contract in its Enforcement Motion, when it alleged:

> *Indeed, this Court itself later expressly stated that it had approved the [Settlement Agreement] as part of a modified judicial order rather than mere acceptance of a settlement agreement....* The [Federal District Court] described the modification of its "original remedial injunction" as *"similar to a consent decree,"* which it defined as *"a negotiated settlement of a case enforced through the court's inherent power to enforce its own equitable decrees or orders."* ... In particular, the [Federal District Court] emphasized that the modification occurred "after an adjudication on the merits," that it was entered without Plaintiffs' consent, and that "satisfaction of the terms of the

[Settlement Agreement] [would] not necessarily end the case or the State's liability." ... *In light of these circumstances, the [Federal District Court] interpreted the "court-approved agreement as a judicial decree, not a contract."*

(Emphasis added.)

We agree. The Settlement Agreement could not be enforced by a breach of contract action as a matter of law, and the State's motion for summary judgment on the breach of contract claim was erroneously denied.

 To establish a breach of contract, the party claiming breach must show: (1) the existence of an enforceable contract; (2) the presence of mutual obligations under the contract; (3) the failure to perform an obligation specified in the contract; and (4) damages. *Superior Ins. Co. v. Univ. Underwriters Ins. Co.*, 62 S.W.3d 110, 118 (Mo.App. S.D.2001). "If a party fails to prove one of the elements of a breach of contract action, his claim fails." *Midwest Bankcentre v. Old Republic Title Co. of St. Louis*, 247 S.W.3d 116, 128 (Mo.App. E.D. 2008).

Here, as we have discussed, the Judgment began its analysis of the School District's breach of contract claim with element two, finding that the State was collaterally estopped to deny that it had certain obligations under the Settlement Agreement. The Judgment then moved to element three, finding that the State was estopped to deny that it failed to perform those obligations. The Judgment then found element four, damages. In no manner, however, did the Judgment address the first, and in this case the most critical, element of a breach of contract claim—*the existence of an enforceable contract. Rice v. James*, 844 S.W.2d 64, 69 (Mo.App. E.D.1992) (finding a party was not entitled to judgment

on a breach of contract action when he failed to prove the existence of an enforceable contract).

 "The essential elements of an enforceable contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement and mutuality of obligation." *L.B. v. State Committee of Psychologists*, 912 S.W.2d 611, 617 (Mo.App. W.D.1995) (rejecting a party's effort to enforce a compromise settlement because it was not an enforceable contract). It requires no citation to observe the obvious—unless a contract is subject to enforcement in a breach of contract action, it is not an enforceable contract.

Here, it is uncontested that when the Settlement Agreement was executed, it was not an enforceable contract. Paragraph 9 expressly provided that "This Agreement is contingent upon Court approval, and ... shall not become binding on any of the parties unless and until final court approval, as defined in subparagraph 2, is obtained."

Even without this provision, the Agreement was not an enforceable contract upon its execution, as its object was beyond the power of the State and the School District to effectuate. The object of the Agreement was to relieve the State of its joint and several liability to remediate the vestiges of discrimination pursuant to the Desegregation Orders. The Agreement hoped to secure the State's dismissal from the Desegregation Litigation. As the School District freely admits, the plaintiff schoolchildren in whose favor the Desegregation Orders were entered were not parties to the Agreement, and opposed court approval of the Agreement. The State and the School District had no power to accomplish the objective of the Agreement. The objective of the Agreement could only

be accomplished if the Federal District Court agreed to modify the Desegregation Orders. The Agreement was thus not an enforceable contract at its execution, as in the absence of Federal District Court approval and corresponding modification of the Desegregation Orders, neither the State nor the School District could bind the other to performance.

The Agreement was at best an expression of joint intent to work together to secure a modification of the Desegregation Orders over the plaintiff school children's objections. Whether we characterize the State and the School District as not "competent" to contract for the purpose stated, or the Agreement as addressing an improper object, the result is the same. The Settlement Agreement was not an enforceable contract at the time of its execution. *See Jenks v. Jenks,* 385 S.W.2d 370, 374 (Mo.App.1965) (holding an agreement where parties promised to work together to reach an understanding about a specific school could not be compelled as to either party and was thus not an enforceable contract as its "object" was not secured by the contract, but "deliberately reserved for future" determination).

In this respect, the Settlement Agreement was akin to a written agreement purporting to address custody and child support for minor children. It is widely recognized in the State of Missouri that "where the object of [a] contract ... is to provide for the welfare of a child ... no contract of the parties will be binding." *Jenks,* 385 S.W.2d at 377. Efforts to contract as to child custody, support, or visitation are not binding on a trial court. *Williams v. Cole,* 590 S.W.2d 908, 911 (Mo. banc 1979). This is primarily a function of the trial court's obligation to "protect the best interests" of the *non-party children. McCreary v. McCreary,* 954 S.W.2d 433, 452 (Mo.App. W.D.1997). "[A]lthough the

trial court may consider the parents' wishes on these issues, it is not to be a rubber stamp." *Id.*

Similarly, the Settlement Agreement entered into between the School District and the State was not binding on the non-party plaintiff schoolchildren, or on the Federal District Court. The Federal District Court's primary function was to oversee the remedial efforts to desegregate the School District, and to impose obligations on the jointly and severally liable defendants (the School District and the State) it deemed to be in the best interests of the plaintiff schoolchildren. Thus, as with "contracts" between parents addressing child custody and child support issues, the only means by which the terms of the Agreement could have become "enforceable" was through their approval by, and incorporation into, a court order. This is conceded by the School District which observed in its Enforcement Motion:

> The [Federal District Court] not only incorporated the [Settlement Agreement] ... into its [orders approving the Settlement Agreement] (over Plaintiffs' objections) *but also specified further conditions that were necessary to its approval and to the subsequent dismissal* of the State....

(Emphasis added.)

Having concluded that the Agreement was not an enforceable contract when it was executed, we next evaluate whether it became an independently enforceable contract when it was approved by the Federal District Court. It is a recognized principle of law that where the object of a contract is one which the parties are not authorized to finally dispose, a decree approving the contract merges the contract with the decree. *Jenks,* 385 S.W.2d at 375, 377. "Thereafter the contractual provisions are to be enforced as an order of the court, and may be re-

formed or amended only by a modification of the decree." *Id.* at 375.[21]

This is precisely what the Eighth Circuit held when it rejected the plaintiff school-children's objections to the Approval Order.

> The Class analogizes the [Agreement] to a contract and contends that it cannot be bound by a contract to which it is not a party. ***Regardless of the [Agreement], the District Court's order is not akin to a contract.***

*Jenkins,* 122 F.3d at 604 n. 11 (emphasis added). In its Enforcement Motion, the School District echoed this refrain. The School District correctly observed that the Federal District Court had refused to merely approve the Settlement Agreement as a free standing contract but instead:

> *[E]xpressly stated that it had approved the [Settlement Agreement] as part of a modified judicial order rather than mere acceptance of a settlement agreement*.... The [Federal District Court] described the modification of its "original remedial injunction" as *"similar to a consent decree,"* which it defined as *"a negotiated settlement of*
>
> *a case enforced through the court's inherent power to enforce its own equitable decrees or orders."* ... In particular, the [Federal District Court] emphasized that the modification occurred "after an adjudication on the merits," that it was entered without Plaintiffs' consent, and that "satisfaction of the terms of the [Settlement Agreement] [would] not necessarily end the case or the State's liability." ... *In light of these circumstances, the [Federal District Court] interpreted the "court-approved agreement as a judicial decree, not a contract."*

In rejecting the State's appeal from the June 15, 2006 Order and the November 21, 2006 Amended Order, the Eighth Circuit solidified the point.

> The District Court reiterated that it had *approved the [Settlement Agreement] "as part of a modified judicial order"* and noted that "[t]he Eighth Circuit has taken the view that *the State was dismissed pursuant to an order of the Court modifying an earlier remedy and not pursuant to an unincorporated*

---

**21.** The corollary principle is not applicable to this case. Generally, where the object of the contract does not, by its nature, require court approval to render the terms of the contract enforceable, court "approval" of the contract does not merge the contract with the decree, and the contract remains independently enforceable. *See, e.g., Telge v. Telge,* 677 S.W.2d 403, 406–07 (Mo.App. W.D.1984); *Nelson v. Nelson,* 516 S.W.2d 574, 578 (Mo.App.1974); *Welsh v. Welsh,* 230 Mo.App. 1006, 93 S.W.2d 264, 270–71 (1936). Even in such circumstances, the parties can elect to have the otherwise enforceable contract incorporated into a decree (as distinguished from simply being approved by the court), in which case the contract does merge with the decree, and is thereafter only subject to enforcement or modification by the court. *See, e.g., Toth v. Toth,* 483 S.W.2d 417, 422 (Mo.App.1972); *Jenks,* 385 S.W.2d at 375. So long as the object of the contract addresses a matter

about which the parties have the power to lawfully contract, whether the agreement is to remain contractual or to become decretal depends on the intention of the parties. *See, e.g., Yalem v. Yalem,* 801 S.W.2d 439, 441 (Mo.App. E.D.1990); *Kirk v. Kirk,* 598 S.W.2d 153, 155 (Mo.App. E.D.1980); *Jenks,* 385 S.W.2d at 374–75. These principles have no application, however, where the object of a contract exceeds the power of the parties to enter into a binding contract. *See, e.g., McCreary,* 954 S.W.2d at 451–52 ("[T]he trial court is not bound by the parties' agreements as to child custody, support, or visitation. The parties cannot by separation agreement, even if incorporated in the decree, preclude the trial court from modifying child support. In other words, child support awards, like custody and visitation awards, remain subject to modification until the court loses jurisdiction.") (internal citations omitted); *Jenks,* 385 S.W.2d at 376–77.

*settlement agreement." The District Court thus concluded that it had ancillary jurisdiction to enforce the terms of the Agreement as incorporated into court orders.* We reach the same conclusion.

. . .

[T]he District Court stated, *"Properly understood, the approval of the [Agreement] was a court-determination to release the State from liability over the objections of Plaintiffs—it was not a consensual settlement agreement."* The court stated: *"The Agreement and the [Approval Order], which approved the Agreement, modified the Court's original remedial injunction."* The court was persuaded "to *view the court-approved Agreement as a judicial decree, not a contract,"* and to "look to law governing judgments, not contract law, to interpret and implement the Agreement and the [Approval Order]." The District Court concluded that *"once the Court approved the Agreement, its terms transformed from a contract to a court judgment."*

*Jenkins,* 516 F.3d at 1081–82 (emphasis added) (internal citations omitted).

It is readily apparent, therefore, that the Settlement Agreement did not become an independently enforceable contract upon its indispensable approval by the Federal District Court, and incorporation into the Approval Order. Its terms as approved and modified[22] are no doubt binding on the State and the School District, but only to the extent and because said terms were incorporated and merged into one or more Federal District Court Orders. Quite plainly, the Federal District Court and the Eighth Circuit expressed the intent to retain the ability to change the "contract," if appropriate, consistent with the fact that the "contract" was not independently enforceable, but was instead transformed into a judicial decree that remained subject to the Federal District Court's continuing ancillary jurisdiction. *Id.*

As a result, the circumstances here are distinguishable from those in *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). In *Kokkonen,* the United States Supreme Court held that in general, where a federal lawsuit is dismissed based upon a stipulated settlement agreement, a subsequent claim of breach of, or seeking to enforce, the settlement agreement is a matter for state courts to determine. *Id.* at 381–82, 114 S.Ct. 1673. However, if the settlement agreement has been embodied in the federal court's dismissal order or the federal court has indicated its intent to retain jurisdiction over the settlement agreement, then efforts to enforce the agreement are subject to federal ancillary jurisdiction. *Id.* " 'Courts have inherent power *to enforce their own judgments.' " Multidata Sys. Int'l Corp. v. Zhu,* 107 S.W.3d 334, 339 (Mo.App. E.D. 2003) (quoting *Lake Thunderbird Prop. Owners Ass'n, Inc. v. Lake Thunderbird, Inc.,* 680 S.W.2d 761, 763 (Mo.App. E.D. 1984)). In the case of injunctive relief, like the relief afforded by the Federal District Court Orders, the issuing court "retain[s] jurisdiction to vacate or modify the terms of the injunction in order to avoid unjust or absurd results when a change occurs in the factual setting or the law which gave rise to its existence." *Twedell v. Town of Normandy,* 581 S.W.2d 438, 440 (Mo.App. E.D.1979) (citing *United States v. Swift &*

**22.** Recall that the Federal District Court increased the State's payment obligation from $314,000,000 to $320,000,000.

*Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932)) 43A C.J.S. *Injunctions* Sections 367–369, pp. 420–24 (addressing power of trial court to enforce, dissolve, modify, or continue an injunction it has issued, and that the authority to do so belongs solely to the trial court that issued the injunction). This retained jurisdiction includes the authority to determine the meaning of terms in an incorporated settlement agreement. *See Jenks,* 385 S.W.2d at 375 ("[W]hen the essential rights of the parties are influenced by the original contract, the court will look behind the judgment for the purpose of ascertaining what the original contract was.") (citation omitted).

It is thus immaterial whether the Federal District Court or the Eighth Circuit conclusively found that the State's enactment of section 33.315 (and subsequent repeal of section 160.415.2(5)) breached an original term of the Settlement Agreement, breached the spirit and/or intent of any of the remedial Desegregation Orders, reflected a changed circumstance not anticipated by the Settlement Agreement, or simply exceeded the caveat in the Dismissal Order which tempered the absolute nature of the State's dismissal from the Desegregation Litigation. All that is material for our purposes is that the *only* means by which the terms of the Settlement Agreement could have been enforced was through an action in the Federal District Court to enforce the Federal District Court Order(s) into which the Agreement was merged. *Jenks,* 385 S.W.2d at 375 (holding that upon merger of contract into a decree, "[t]hereafter the contractual provisions are to be enforced as an order of the court, and may be reformed or amended only by a modification of the decree"); 15A C.J.S. *Compromise & Settlement* Section 38, p. 118 ("A judicially entered settlement agreement that becomes part of the stipulation that ends litigation has the force and effect of a judicial decree. Settlement agreements that have been 'so ordered' by the court have the same effect as though the court itself had rendered a decision in the matter.").

This was precisely the course of action taken by the School District when it filed its Enforcement Motion. What the School District and the trial court failed to appreciate, however, is that this was the *only* course of action available to address whether the Agreement had been violated, or whether the remedial relief ordered by the Federal District Court should be further modified, notwithstanding the terms of the Agreement, to effectuate the intent of the Desegregation Orders.

In light of the foregoing discussion, we conclude that the Settlement Agreement was not an independently enforceable contract, as it had been incorporated and merged into a Federal District Court Order and could only be enforced by the Federal District Court through the exercise of its retained ancillary jurisdiction. It was thus error, as a matter of law, for the trial court to entertain, let alone enter a judgment in favor of the School District on, a claim for breach of contract against the State. It follows that the Judgment erroneously awarded damages for breach of contract. We reach this conclusion without the need to address whether the School District was "collaterally estopped" to seek damages from the State by the January 31, 2007 Order. We reach this conclusion for the obvious reason that the trial court could not award breach of contract damages in the absence of an independently enforceable contract. Put simply, the trial court had no authority, regardless the theory pled or asserted by the School District in the State Court Action, to remediate a claimed violation of the Federal District

Court Order or Orders which incorporated the Settlement Agreement.

The State's Points One, Two, Three, and Four are granted. The trial court erroneously entered summary judgment in favor of the School District and against the State for breach of contract, and erroneously denied the State's cross motion for summary judgment on the same subject. The trial court's Judgment in favor of the School District and against the State on Count II of the School District's Third Amended Petition for breach of contract is reversed.

Pursuant to Rule 84.14, "[u]nless justice otherwise requires, the court shall dispose finally of [a] case." In this regard, we are directed to "give such judgment as the court ought to give." Rule 84.14. We therefore enter judgment in favor of the State and against the School District on Count II of the School District's Third Amended Petition which asserted a claim for breach of contract.

We correspondingly reverse the trial court's dismissal as moot of Count I of the Third Amended Petition which sought a declaration that section 33.315 violated the Settlement Agreement and Federal District Court orders and which sought the "equitable relief" of a judgment ordering repayment of the Diverted Withhold.[23] We enter judgment in favor of the State and against the School District on Count I of the Third Amended Petition.

### (b) The State's Point Five

The State's fifth point on appeal claims error in the trial court's grant of summary judgment in favor of the School District on Count III which sought judicial review of an administrative claim. This claim arose out of DESE's rejection of the School District's request that DESE restore the Diverted Withhold as an "overpayment" by the School District to charter schools. The School District made this request pursuant to a procedure described in section 160.415.5. Specifically, on December 3, 2007, the School District requested that DESE withhold the Diverted Withhold "from its future payments to charter schools and transfer the same amount to the [School District]." This request was thus made *after* the January 31, 2007 Order denied the School District's request that the State be ordered to repay the Diverted Withhold. On December 9, 2008, DESE denied the School District's request.

DESE's administrative determination was a non-contested case. Pursuant to section 536.150, the trial court was thus obliged to review DESE's determination *de novo*. *City of Valley Park v. Armstrong*, 273 S.W.3d 504, 508 (Mo. banc 2009). On appeal in a non-contested case, we "review the judgment of the circuit court, not the decision of the administrative agency." *Missouri Nat. Educ. Ass'n v. Missouri State Bd. of Educ.*, 34 S.W.3d 266, 274 (Mo.App. W.D.2000). Thus, our review of the trial court's summary judgment in favor of the School District on Count III "is essentially the same as the review for a court-tried case." *Id.* Accordingly, we review the trial court's judgment on Count III "to determine whether its findings that [DESE's] decision was or was not unconstitutional, unlawful, unreasonable, arbitrary, capricious, or the product of an abuse of discretion rests on substantial evidence and correctly declares and applies the law." *Id.*

---

**23.** The Judgment dismissed this claim as "moot," a disposition still technically applicable given our entry of judgment in favor of the State on Count II, the breach of contract claim. However, to avoid any confusion, we enter judgment in favor of the State on Count I, the declaratory judgment claim.

In granting summary judgment in favor of the School District on Count III, the trial court held that DESE's decision was unreasonable, arbitrary, capricious, and an abuse of discretion. The trial court also held that "DESE's administrative decision refusing to restore the [Diverted Withhold] must be reversed because it is unconstitutional (violating the Supremacy Clause) and illegal (violating the [Federal District Court's] injunction.)" We must separately analyze each of these stated bases for the Judgment to determine whether the trial court's conclusion "rests on substantial evidence and correctly declares or applies the law."

### (i) Supremacy Clause

 The School District argues that the trial court was required to order DESE to restore the Diverted Withhold from charter schools by the Supremacy Clause of the United States Constitution.[24] The trial court incorporated the School District's argument in its Judgment, finding:

> To the extent the [State] claim[s] this Court may ignore the [Federal District Court's] and Eighth Circuit's analysis, this Court disagrees. Apart from the fact that the State and its various departments were bound to follow the [Federal District Court's] orders under the Supremacy Clause, as a matter of State law, this Court must give effect to the decisions of the [Federal District Court] and the Eighth Circuit just like a federal court would.... [T]his Court has an obligation to enforce the [Federal District Court] and the Eighth Circuit's orders and analysis.

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Under the Supremacy Clause, state laws and constitutional provisions are 'preempted and have no effect' to the extent they conflict with federal laws." *Johnson v. State*, 366 S.W.3d 11, 27 (Mo. banc 2012). The Supremacy Clause "applies with its full force to orders of a federal court" interpreting the federal constitution in school desegregation cases. *Pennell v. Collector of Revenue*, 703 F.Supp. 823, 826 (W.D.Mo.1989) (citing *Cooper v. Aaron*, 358 U.S. 1, 17, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958)).

 The School District argues that the trial court was bound by the Supremacy Clause to require the State to recoup the Diverted Withhold because to do otherwise would permit the State to enforce section 33.315 between April 2005 and June 2006 notwithstanding the Federal District's Court determination that the statute "violated" the federal court orders.

The School District's argument presumes (and the trial court found) that the Federal District Court conclusively "found" that the State's adoption of section 33.315 violated its prior orders. We question this conclusion for the same reason we questioned the conclusion that the Federal District Court "found" that that the State breached the Settlement Agreement. *See* discussion *supra*.

Independent of its suspect foundation, an even more fundamental difficulty with the School District's argument is that it ignores the January 31, 2007 Order issued *after* the School District attempted to enforce the June 15, 2006 Order. The June 15, 2006 Order enjoined the State as follows:

> [T]he Court GRANTS the [Enforcement Motion]. The State Defendants are

---

24. U.S. Const. art. VI, cl. 2.

hereby enjoined from requiring the School District to divert any funds from the $4.95 per $100 property tax levy to the charter schools until 2014 or until [the School District] has completed repayment of the court-ordered desegregation bonds, whichever first occurs. ***This applies prospectively and retroactively to any funds excepted under section 160.415.2(5) between 1999 and 2005.***

(Emphasis added.) The School District argued to the Federal District Court that the highlighted language obligated the State to repay the Diverted Withhold.

The Federal District Court disagreed. The January 31, 2007 Order denying the School District's request held:

The [School District] asserts that this Order directs that Mo.Rev.Stat. section 160.415.2(5) funds were wrongfully diverted to the charter schools by operation of Mo.Rev.Stat. section 33.315 and the State should return the funds to [the School District]. The [School District] seize[s] on the term *retroactively* to establish their right to monetary relief for the funds transferred to the charter schools in 2005 and 2006. The State argues that the language of the Order simply enjoins the further operation of Mo.Rev.Stat. section 33.315 and Missouri Senate Bill 287, 2005 Mo Legis. Serv. S.B. 287 (West).[25]

The [State] correctly restate[s] the intent of the Court.[26]

(Emphasis in original.) After concluding that the June 15, 2006 Order did not by its *express* terms require the State to repay the Diverted Withhold, the Federal District Court also concluded that *equity* did not require the State to repay the Diverted Withhold.

The June 15, 2006 Order adequately protects [the School District's] ability to continue payments on its Court-ordered bonds through 2014, and equity does not require the State to reimburse [the School District] for the funds transferred to the charter schools from April 2005 through June 2006.

The Federal District Court could have required the State to restore the Diverted Withhold had it believed its June 15, 2006 Order, or any of its other orders in the Desegregation Litigation obligated the State to do so. *Hutto v. Finney*, 437 U.S. 678, 691, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (holding it does not violate the Eleventh Amendment to impose a financial penalty on a state agency as a "remedial fine" to "compensate[ ] the party who won the injunction for the effects of his opponent's noncompliance"). It did not do so for two reasons—first because it found that the June 15, 2006 Order did not expressly require this of the State, and second because it found that equity did not require this of the State.

Assuming, *arguendo*, that the Supremacy Clause is, in fact, implicated by the facts in this case, it obliged the trial court to abide by[27] *all* of the Federal District

---

**25.** This Senate Bill repealed section 160.415.2(5), effective July 1, 2006, though the June 15, 2006 effectively enjoined the repeal. Section 160.415.2(5) is the provision which permits the School District to withhold from amounts it is otherwise obligated to pay charter schools the amount required to service the leasehold revenue bonds.

**26.** The January 31, 2007 Order is a perfect illustration of why only an issuing court ought to be interpreting its own orders.

**27.** We use the phrase "abide by," in lieu of the word "enforce" employed by the trial court. The word "enforce" implies the power to determine whether a violation of a federal court order has occurred, and the power to remediate any violations found, powers the trial court did not possess.

Court orders, including the January 31, 2007 Order. The trial court had no authority to afford the School District a remedy which presupposed that section 33.315 violated a Federal District Court order, when the Federal District Court expressly found that neither its orders nor general principles of equity required that remedy.

The trial court's conclusion that it was obligated by the Supremacy Clause to require DESE to restore the Diverted Withhold erroneously declares and/or applies the law.

### (ii) Violation of Federal Court Orders

 The trial court concluded in its Judgment with respect to Count III:

> As the [Federal District Court] explained, the terms of the Settlement Agreement ... were *incorporated* into the [Federal District Court's] 1997 order that dismissed the State from the [Desegregation Litigation] upon the condition that the State would abide by the terms of the Settlement Agreement.... Therefore any violation of the Settlement Agreement violated the terms of the [Federal District Court's] 1997 order dismissing the State from the [Desegregation Litigation].[28]

(Emphasis in original.) The trial court thus concluded that because the Diverted Withhold violated a Federal District Court order, it was illegal, and had to be restored

28. We remind of, but need not again explain, our reticence to accept the trial court's characterizations of the Federal District Court Orders and Eighth Circuit Opinions as conclusively "finding" that the State breached the Settlement Agreement or any federal court order.

29. The School District repeatedly emphasizes that the remedy it sought from the Federal District Court was "equitable," not "legal." This distinction is immaterial where, as here, the remedy (regardless its label) was designed to remediate a claimed violation of a Federal District Court order and/or a claimed breach

to the School District. For the reasons discussed, *supra*, the Supremacy Clause commands the trial court to abide by the Federal District Court's determination that its orders (including the June 15, 2006 Order) did not require the State to restore the Diverted Withhold to the School District. The trial court's conclusion to the contrary erroneously declares and/or applies the law.

In any event, as we have discussed in detail, *supra*, the Federal District Court retained exclusive jurisdiction over the enforcement, modification, dissolution, and continuation of the injunctions issued in the Desegregation Litigation, including the Approval Order which incorporated the Settlement Agreement. 42A C.J.S. *Injunctions* Sections 367–369, pp. 420–24. The trial court had no authority to impose a remedy for the State's conduct, presupposing for the sake of argument that said conduct "violated a federal court order," and certainly had no authority to order a remedy that had already been considered and rejected by the Federal District Court.[29]

### (iii) Unreasonable, arbitrary, capricious, and abuse of discretion

The trial court concluded that DESE's rejection of the School District's request for restoration of the Diverted Withhold

of the Settlement Agreement merged with the Approval Order. Addressing whether the request for restoration of funds was equitable or legal places the emphasis in the wrong place. The controlling principle is that the exclusive means for enforcing the Settlement Agreement whose terms merged into the Approval Order was by a request for enforcement filed with the Federal District Court. (*See* discussion, *supra* ). The Federal District Court, not the trial court, had the authority to remediate violations of the Federal District Court's injunctive orders.

was unreasonable, arbitrary, capricious, and an abuse of discretion.

The School District's request was made on December 3, 2007 pursuant to section 160.415.5. The version of section 160.415.5 in effect at that time provided:

> If a school district fails to make timely payments of any amount for which it is the disbursal agent, the state department of elementary and secondary education shall authorize payment to the charter school of the amount due pursuant to subsection 2 of this section and shall deduct the same amount from the next state school aid apportionment to the owing school district. *If a charter school is paid more or less than the amounts due pursuant to this section,* the amount of overpayment or underpayment shall be adjusted equally in the next twelve payments by the school district or the department of elementary and secondary education as appropriate.

(Emphasis added.) The trial court never addressed section 160.415.5 in its Judgment, and thus never determined whether the statute obligated DESE to restore the Diverted Withhold. DESE's obligation arose, if at all, pursuant to section 160.415.5. It is difficult to comprehend how the trial court could have fulfilled its obligation to review this non-contested case *de novo* without discussing the source of DESE's alleged obligation.

Instead, the trial court supported its entry of judgment on Count III based solely on its review and rejection of DESE's written explanation for its denial of the School District's request. The trial court found that the *only* basis for DESE's decision stated in its December 9, 2008 denial letter was as follows:

> The discontinuation of the desegregation withholdings from April of 2005 to June 2006 was based upon an action of the [Board of Fund Commissioners] under color of law. Further payment made to charter schools, during the period in question, did not violate any court ruling. Therefore, DESE must deny the request of [the School District] to withhold funds.

The trial court determined that these "findings and conclusions are clearly erroneous as a matter of fact and law," because (a) the Federal District Court did find that section 33.315 violated a court ruling, and (b) illegal state conduct is not excused "under color of law," particularly where the Supremacy Clause requires the trial court to follow the Federal District Court's orders. The trial court thus supported its finding that DESE's decision was unreasonable, arbitrary, capricious, and an abuse of discretion circuitously by reliance on its findings about the Supremacy Clause and a determined violation of federal court orders. We have already explained the erroneous nature of those findings.

We further observe that the trial court failed to address the *actual* findings on which DESE relied to reject the School District's request. DESE's denial letter found (i) that the 2005 determinations of the Board of Fund Commissioners and the Board of Education were authorized by Missouri statute in effect at that time, and (ii) that the Federal District Court had already denied the School District's request for repayment of the Diverted Withhold. Immediately following its discussion of these findings, DESE's denial letter states *"[b]ased on these findings,* it is my determination that there is no basis for DESE to withhold funds pursuant to Section 160.415.5 RSMo." [30] The trial court's

---

**30.** The paragraph from DESE's denial letter quoted in the Judgment *follows* this state-

ment, calling into question the trial court's conclusion that the paragraph it quoted from

failure to acknowledge or address these findings casts further suspicion on the trial court's conclusion that DESE acted unreasonably, arbitrarily, capriciously, and in abuse of its discretion when it denied the School District's request.

We address DESE's findings in reverse order. DESE's second finding relied on the July 31, 2007 Order. We have already explained that the July 31, 2007 Order found that the State was not required to restore the Diverted Withhold by the express terms of the June 15, 2006 Order or as a matter of equity. As this determination bound the trial court pursuant to the Supremacy Clause, so too it bound DESE. Thus, DESE's reliance on the Federal District Court's refusal to order the State to pay the Diverted Withhold as a basis for denying the School District's request under section 160.415.5 was not unreasonable, arbitrary, capricious, or an abuse of its discretion.

DESE's first finding concluded that the 2005 decision by the Board of Fund Commissioners which was approved by the Board of Education was authorized by Missouri statutes *then in effect*. This is indisputably true. In fact, it was the State's 2005 enforcement of sections 160.415 and 33.315 as written that gave rise to the School District's Enforcement Motion. DESE thus concluded that between April 2005 and June 2006, the School District withheld exactly what Missouri statutes permitted it to withhold, and transferred to the charter schools exactly what Missouri statutes obligated it to transfer. Thus, DESE argues that there has been no "overpayment," the trigger required to invoke DESE's obligation under section 160.415.5 to recoup money from the charter schools. We agree.

The interpretation of a statute is a question of law. *Richard v. Missouri Dept. of Corrections*, 162 S.W.3d 35, 37 (Mo.App. W.D.2005). "In determining legislative intent, we construe words and phrases used in [a] statute in their plain, ordinary, and usual sense." *Id.* at 39. The phrase "due pursuant to this section" is unambiguous. The plain and clear meaning of the phrase required DESE, if asked to do so, to determine the amount section 160.415 required a school district to transfer to charter schools during a time period under review. This necessarily temporal calculation would have required DESE to consider section 33.315, which expressly references section 160.415, and restricts the withhold permitted by section 160.415.2(5).

To be sure, the June 15, 2006 Order enjoined the *further* enforcement of section 33.315, and thus restricted the State from *thereafter* requiring the School District to reduce the withhold otherwise permitted by section 160.415.2(5). However, as the November 21, 2006 Order clarified, the June 15, 2006 Order prohibited the State from requiring the School District to transfer *any further funds* to charter schools. The June 15, 2006 Order did not require the State to reimburse the School District for funds it had already transferred to the charter schools. The School District cannot establish, therefore, an "overpayment" pursuant to section 160.415.5.

To overcome this difficulty, the School District argues that because section 33.315 was illegal from its inception, its application was at all times illegal, automatically rendering the Diverted Withhold an "overpayment." Once again, we are returned full circle to the School District's recurring claim that the Federal District Court and/or the Eighth Circuit conclusively "found" that section 33.315 violated an ex-

the denial letter in fact formed the basis for DESE's decision.

isting federal court order. Even if accepted as a legitimate premise, it remained exclusively within the province of the Federal District Court to remediate any violation of its orders. More to the point, even if section 33.315 was illegal from its inception, it does not follow that withholds were incorrectly calculated pursuant to the formula described in section 160.415 as modified by the operation of section 33.315. The School District conflates the legality of section 33.315 with its technically accurate application prior to entry of the June 15, 2006 Order.

DESE's reliance on a finding that Missouri statutes in effect in 2005 had been properly applied and that the School District thus had not "overpaid" charter schools pursuant to those statutes as a basis for denying the School District's request for restoration of the Diverted Withhold was not unreasonable, arbitrary, capricious, or an abuse of discretion. The trial court incorrectly declared and applied the law when it concluded that DESE's rejection of the School District's request for restoration of the Diverted Withhold was unreasonable, arbitrary, capricious, and an abuse of discretion.

The State's Point Five is granted. The trial court's judgment in favor of the School District and against DESE on Count III ordering DESE to repay the Diverted Withhold to the School District by recouping same from the Charter Schools is reversed. Pursuant to Rule 84.14, we grant such judgment as we ought to give, and enter judgment in favor of DESE and against the School District on Count III of its Third Amended Counterclaim seeking judicial review of an administrative decision.

### The Charter Schools' Points on Appeal

The Judgment granted summary judgment in favor of the School District and against the Charter Schools on Count I of the Second Amended Cross–Claim—a claim for money had and received. The Judgment correspondingly denied the motion for summary judgment filed by the Charter Schools. To secure summary judgment in its favor on its claim for money had and received, the School District was required to allege undisputed facts establishing each and every element of its claim and negating each affirmative defense asserted as a bar to recovery on its claim. *Evans v. Eno,* 903 S.W.2d 258, 259–60 (Mo.App. W.D.1995) (holding that claimant who seeks summary judgment must support each element of claim with admissible uncontested facts to demonstrate right to judgment as a matter of law); *Mobley v. Baker,* 72 S.W.3d 251, 259 (Mo.App. W.D.2002) ("In failing to allege specific facts in his motion for summary judgment sufficient to negate the appellants' affirmative defense, the respondent failed to make a *prima facie* case for summary judgment, requiring us to reverse the summary judgment for the respondent.").

The Charter Schools (excluding Gordon Parks Elementary School) assert six points on appeal: (1) the trial court erred in granting summary judgment in favor of the School District for money had and received because the School District failed to negate the affirmative defense of issue preclusion as the Federal District Court ruled that equity did not require return of the Diverted Withhold to the School District; (2) the trial court erred in granting summary judgment in favor of the School District for money had and received because the School District failed to negate the affirmative defense of voluntary payment; (3) the trial court erred in granting summary judgment in favor of the School District for money had and received because insufficient or contested facts prevented the conclusion that the elements of

appreciation of a benefit and/or of receipt and retention of funds under circumstances that were unjust had been established as a matter of law; (4) the trial court erred in granting the School District's claim under Count III for judicial review of administrative action because DESE did not violate federal court orders and based its decision to deny the School District's demand for repayment of the Diverted Withhold on a reasonable construction of federal court orders and existing statutes; (5) the trial court erred in awarding the School District prejudgment interest because no demand was made; and (6) the trial court erred in denying the Charter Schools' motion for summary judgment on the money had and received claim because (a) the School District is estopped to recover the Diverted Withhold by the order of the Federal District Court denying that relief, (b) the School District paid the Diverted Withhold voluntarily, (c) DESE's denial of the School District's claim for repayment was not arbitrary, capricious, or unreasonable, and (d) section 160.415.5 does not apply to this case.

Gordon Parks Elementary School asserts four points on appeal: (1) the trial court erred in granting summary judgment in favor of the School District on Count II for breach of contract; (2) the trial court erred in granting summary judgment in favor of the School District on Count III for judicial review of an administrative claim; (3) the trial court erred in granting summary judgment in favor of the School District for money had and received because the School District failed to establish it was entitled to judgment as a matter of law in that (a) the Federal District Court preclusively ruled that the School District was not entitled to reimbursement of the Diverted Withhold, (b) the School District failed to negate the Charter Schools' affirmative defenses to the claim for money had and received, and

(c) the School District failed to demonstrate that no genuine issues of material fact existed as to each of the elements of a claim for money had and received; and (4) the trial court erred in awarding pre-judgment interest against the Charter Schools because (a) section 160.415.5 does not authorize pre-judgment interest, and (b) equity does not support an award of pre-judgment interest.

The Charter Schools collective points on appeal addressing the entry of judgment in favor of the School District on either Count II and Count III of the Third Amended Petition (Charter Schools' Point Relied On 4, and Gordon Parks Elementary School's Points Relied On 1 and 2) are rendered moot by our reversal of the entry of judgment in favor of the School District, and our entry of judgment in favor of the State and/or DESE, on those counts.

The remaining Points Relied On asserted by the Charter Schools (including Gordon Parks Elementary School) fall generally into three categories: (i) those contesting the grant of summary judgment and/or the denial of summary judgment on the money had and received claim because all elements of the claim were not established as a matter of law and/or an affirmative defense of voluntary payment was established as a matter of law (Charter Schools' Points Relied On 2, 3 and 6(b),(c) and (d), and Gordon Parks Elementary School's Points Relied On 3(b) and 3(c)); (ii) those arguing that the Federal District Court's finding that the School District was not entitled to recover in equity for the Diverted Withhold precluded the School District from seeking that relief through a claim for money had and received (Charter Schools' Points Relied On 1 and 6(a), and Gordon Parks Elementary School's Point Relied On 3(a)); and (iii) those contesting the award of pre-judgment interest on the money

had and received judgment (Charter Schools' Point Relied On 5, and Gordon Parks Elementary School's Points Relied On 4(a) and (b)).

We find that the Points Relied On in category (i) are dispositive of this case, and render discussion of the Points Relied On in categories (ii) and (iii) unnecessary. The trial court erred as a matter of law in entering summary judgment in favor of the School District, and in denying summary judgment in favor of the Charter Schools, on the claim for money had and received because the School District could not establish each element of the claim as a matter of law and because the affirmative defense of voluntary payment was established as a matter of law.

" 'The appropriate action when one party has been unjustly enriched through the mistaken payment of money by the other party is an action at law for money had and received.' " *Investors Title Co., Inc. v. Hammonds*, 217 S.W.3d 288, 293 (Mo. banc 2007) (quoting *Blue Cross Health Services, Inc. v. Sauer*, 800 S.W.2d 72, 75–76 (Mo.App. E.D.1990)). " 'Although the action is purely one at law, it partakes of the nature of equity, and whenever it is shown that one has money in his possession which rightfully belongs to another, the law establishes privity between the parties, and implies the promise and obligation upon which the action rests.' " *Id.* (quoting *Eichenberg v. Magidson's Estate*, 170 S.W.2d 105, 108 (Mo.App. 1943)). " '[I]t has become axiomatic that the action lies where the defendant has received or obtained possession of the money of the plaintiff, which, in equity and good conscience, he ought to pay over to the plaintiff.' " *Id.* (quoting *Webster v. Sterling Finance Co.*, 351 Mo. 754, 173 S.W.2d 928, 931 (1943)).

"[I]n order for a plaintiff to make a submissible case for money had and received, he must establish the following elements: (1) that the defendant received or obtained possession of the plaintiff's money; (2) that the defendant thereby appreciated a benefit; and (3) that the defendant's acceptance and retention of the money was unjust." *Ward v. Luck*, 242 S.W.3d 473, 476 (Mo.App. E.D.2008).

The trial court found that there was no genuine dispute as to each of the three essential elements of a claim for money had and received. The trial court found that the Charter Schools received millions of dollars from the School District after the State directed that the operation of section 33.315 required the School District to cease its withhold under section 160.415.2(5). The trial court also found that the Charter Schools received these funds from April 2005 to June 2006. The trial court found that the funds received by the Charter Schools were "clearly a benefit because the [Charter Schools] used that money to pay for expenses they otherwise would have paid for with different funds." Finally, the trial court found:

> [The money diverted to the Charter Schools] was, in the eyes of the law, [the School District's] money because the State's forcing [the School District] to divert those funds to the [Charter Schools] was a breach of the Settlement Agreement and an illegal violation of the [Federal District Court's] order.
>
> Because the [Charter Schools] received [the School District's] money as a result of the State's wrongful and illegal enforcement of [section] 33.315, it logically follows that the [Charter Schools'] retention of that money is unjust.

It was erroneous for the trial court to conclude that all of the essential elements of a claim for money had and received were established by the uncontested evi-

dence. We recognize that the Charter Schools argue that none of the essential elements of a claim for money had and received were established by the uncontested evidence. We limit our discussion, however, to the third essential element—whether the Charter School's acceptance and retention of the Diverted Withhold was unjust. We conclude that this essential element was not, and cannot be, established by the uncontested evidence.

The trial court concluded that it would be "unjust" for the Charter Schools to retain the Diverted Withhold because the money was transferred to them as a result of the State's breach of the Settlement Agreement and adoption of section 33.315 in violation of federal court orders. Once again, the Judgment bootstraps a legal conclusion based on the trial court's suspect attribution of findings to the federal courts. We need not revisit our concern with the trial court's attributions. We find that, in any event, the trial court's legal conclusion is fatally incongruent with the January 31, 2007 Order.

An action for money had and received "lies where the defendant has received or obtained possession of the money of the plaintiff, which, *in equity and good conscience,* he ought to pay over to the plaintiff.'" *Investors Title,* 217 S.W.3d at 293 (emphasis added). The Federal District Court held that it was not unjust to deny the School District's request for recovery of the Diverted Withhold *from the State,* the "culpable party" whose conduct the trial court relied upon to derivatively conclude that it would be unjust for the Charter Schools to retain the Diverted Withhold. If "equity and good conscience" do not require the State to repay the School District when it was the State who purportedly breached the Settlement

Agreement and violated Federal District Court orders, then as a matter of law, "equity and good conscience" cannot derivatively require the Charter Schools to repay the School District.

We so hold without the need to resort to a discussion of issue preclusion—a principle argued (and defended) fiercely by the Charter Schools and the School District. The Federal District Court's final and binding conclusion[31] that equity did not require the *State* to repay the Diverted Withhold is an uncontested fact. The Federal District Court based this finding on its determination that the June 15, 2006 Order "adequately protects the School District's ability to continue payments on its court-ordered bonds through 2014," also an uncontested fact. The School District had the burden to demonstrate facts rendering it unjust, as a matter of law, for the Charter Schools to retain the Diverted Withhold. The School District cannot sustain this burden when the uncontested facts establish that it was not unjust to deny the School District the right to recover the Diverted Withhold from the State, whose conduct in enacting section 33.315 placed the Charter Schools in a position to receive the Diverted Withhold.

In addition to finding the essential element of unjust retention based on the State's conduct, the trial court also found that it would be unjust to permit the Charter Schools to retain the Diverted Withhold because the Charter Schools "facilitated" the State's violation of the Settlement Agreement and Federal District Court Orders. The trial court based this conclusion on the uncontested fact that after the State enacted section 33.315, the Charter Schools sought the statute's enforcement. The School District cites no authority for the proposition that it is "unjust" as a matter of law for the beneficiary

---

31. The School District abandoned its appeal of the January 31, 2007 Order.

of a statute to request its enforcement. We conclude that such conduct is not unjust as a matter of law. It is inconceivable that equity would require the beneficiaries of section 33.315 to repay the Diverted Withhold, when equity does not require the State which enacted the statute to repay the Diverted Withhold.

At least one of the essential elements of a claim for money had and received was not, and cannot be, established by the School District as a matter of law. It was error for the trial court to enter judgment in favor of the School District on its claim for money had and received.

■ It was equally erroneous for the trial court to reject, as a matter of law, the affirmative defense of voluntary payment asserted by the Charter Schools. In this regard, the trial court found the following:

> Although the [Charter Schools] argue [the School District] paid the funds under a "mistake of law," it is clear from the undisputed material facts that [the School District] was not mistaken as to the law but insisted from the beginning of this dispute that application of section 33.315 to [the School District] violated the Settlement Agreement and the [Federal District Court's] orders. [The School District] did not pay the funds to the [Charter Schools] voluntarily; indeed, the history of litigation between [the School District], the State, and the [Charter Schools] makes clear that [the School District] took all reasonable actions to prevent its funds from being transferred to the Charter Schools.

The trial court's conclusion reflects a misapprehension of the defense of voluntary payment.

■ "The voluntary payment doctrine is a recognized defense to … an action for money had and received." *Pitman v. City of Columbia*, 309 S.W.3d 395,

403 (Mo.App. W.D.2010) (citing *Huch v. Charter Commc'n, Inc.*, 290 S.W.3d 721, 726 (Mo. banc 2009)). "The doctrine provides 'that a person who voluntarily pays money with full knowledge of all the facts in the case, and in the absence of fraud and duress, cannot recover it back, though the payment is made without sufficient consideration, and under protest.'" *Id.* (quoting *Huch*, 290 S.W.3d at 726). " 'Unless there is fraud or duress, the voluntary payment doctrine prohibits a person who voluntarily pays money with full knowledge of the facts from recovering money.'" *Id.* at 403–04 (citing *Huch*, 290 S.W.3d at 726). Thus, restitution will generally be granted "when payment is made under a mistake of fact but not when the payment is made under a mistake of law." *Id.* (citing *Western Cas. & Sur. Co. v. Kohm*, 638 S.W.2d 798, 800 (Mo.App. E.D.1982)).

Obviously, the School District disputed the legality of the State's enforcement of section 33.315. That "belief" is not the proper focus, however, in assessing the merit of the affirmative defense of voluntary payment. Rather, the focus should have been on whether the School District paid the Diverted Withhold to charter schools, notwithstanding its belief that section 33.315 was illegal, based upon fraud, duress, or a mistake of fact.

We held in *Pitman* that a voluntary payment was an absolute affirmative defense to a claim for money had and received. An employee who protested not being told about the effect of a change in his retirement plan options continued to make contributions to his old retirement plan "under the erroneous conclusion that he had to [do so] to maintain his ability to recover under his claim[ ] of … money had and received." *Pitman*, 309 S.W.3d at 404–05. The employee was operating under a mistake of law *not* with respect to the legality of the change in his plan, but

with respect to the action required of him in response to that change. *Id.* We upheld the trial court's entry of a directed verdict against the employee. *Id.* "[U]nless there is fraud or duress, the voluntary payment doctrine prohibits a person who voluntarily pays money with full knowledge of the facts from recovering money." *Id.* at 403.

Here, the conduct the School District must defend is not its belief about the legality of section 33.315, but rather its decision to pay the Diverted Withhold to charter schools. It is an uncontested fact that the School District did transfer the Diverted Withhold to charter schools. No allegation of a mistake of fact has been made by the School District to explain its transfer of the Diverted Withhold. Nor has the School District claimed fraud. The only explanation the School District offers for its transfer of the Diverted Withhold is that it did what it was told to do, even though it believed the instructions to be illegal. That is not duress.

In *Claflin v. McDonough*, 33 Mo. 412 (1863), an individual paid taxes over to a taxing authority though he believed the law requiring payment of same to be unlawful. *Id.* at 413. The law was later determined to be unconstitutional. *Id.* at 412. The individual sought recovery of the taxes paid on a theory of money had and received. *Id.* at 413. Our Supreme Court held:

> The rule of law [is] well established, both in England and in this country, that a person who voluntarily pays money with full knowledge of all the facts in the case, and in the absence of fraud or duress, cannot recover it back, though the payment is made without a sufficient consideration, and under protest.
>
> . . .
>
> To constitute duress there must be a seizure of the property or arrest of the person, or a threat or attempt to do one or the other, or facts must be stated which tend to show or which warrant the conclusion that such an arrest or seizure could be avoided only by the payment of the tax demanded.
>
> . . .
>
> Threat of legal process is not duress, for the party may plead and make proof and show that he is not liable.
>
> . . .
>
> In the case under consideration the plaintiffs paid the money with a full knowledge of all the facts and circumstances, and well knowing that they were under no legal obligations to pay it. It must, therefore, be regarded as a voluntary payment, and not a payment under duress.

*Id.* at 415–16 (internal citations omitted).

The School District's circumstances are indistinguishable from those in *Claflin.* And the rule of law set forth in *Claflin* is no less viable today notwithstanding its pronouncement nearly 150 years ago.[32] In *Jurgensmeyer v. Boone Hosp. Center*, 727

---

32. We are aware that *Claflin* cannot be read or applied to narrowly and literally require a threat of prosecution *by indictment* to constitute duress. *See Brink v. Kansas City*, 355 Mo. 860, 198 S.W.2d 710, 715–16 (1946) (citing *Mississippi Valley Trust Co. v. Begley*, 298 Mo. 684, 252 S.W. 76, 79 (1923)). We do not rely on *Claflin* for such a proposition, however, and rely instead on its holding that the "[t]hreat of legal process is not duress, for the party may plead and make proof and show that he is not liable." 33 Mo. at 416. This general principle has not been abdicated, although it has been refined. Our Supreme Court observed in *Brink* that although "a threat of serious financial loss" may constitute duress if "an ordinary suit at law or equity might not be an adequate remedy," if a taxpayer has an "adequate remedy by a suit in equity to cancel [a] taxbill[ ] or by resisting a suit at law to collect," there is no duress. 198 S.W.2d at 715. The circumstances in this case fall squarely into the latter category.

S.W.2d 441 (Mo.App. W.D.1987), a father sought the return of money paid to a hospital for his son's medical bills on a theory of money had and received. Father alleged he was obligated to sign an agreement promising to pay the bills under duress as a condition to the hospital's willingness to treat his son. *Id.* at 443. The trial court dismissed the claim as even if Father could demonstrate that he signed the agreement promising to pay under duress, he could not demonstrate that he later paid the bills for his son's treatment under duress. *Id.* at 444. "The failure to allege facts showing that the payment, as contrasted with the signing of the agreement, was made under duress makes it clear that in making the payment, Jurgensmeyer was acting as a volunteer." *Id.* (citing *Claflin,* 33 Mo. at 415).

Similarly, in *American Motorists Ins. Co. v. Shrock,* 447 S.W.2d 809 (Mo.App. 1969), it was observed:

> It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there was no liability to pay in the first instance. This is true even though the payor makes the payment and expressly reserves his right to litigate his claim, or under protest, or under the impression that the demand was legal.

*Id.* at 811–12 (citations omitted). Important to the case before us, the court in *American Motorists* rejected the plaintiff's claim that return of money voluntarily paid was required "in equity and good conscience," (an affirmative element of a money had and received claim) because:

> [T]he rule of law that there can be no recovery of money voluntarily paid with full factual knowledge is founded upon and incorporates within itself the very principles of equity plaintiff insists should govern our decision. In evolving the rule the courts have laid down the requirement that if a person would resist an unjust demand he must do so at the threshold of the matter; that if he intends to litigate the question he must make his defense in the first instance—not later, after paying the money and biding the course of uncertain future events.

*Id.* at 812.

We are, of course, aware that the School District sought and failed to secure a temporary restraining order in the State Court Action against the enforcement of section 33.315. And it is clear from the record that the School District never believed section 33.315 to be enforceable pursuant to the intended import of federal court orders. But the School District nonetheless paid the Diverted Withhold to charter schools. It could simply have refused to do so. Had it refused to do so, the June 15, 2006 Order would have relieved the School District of the obligation to transfer the Diverted Withhold, as *further* enforcement of section 33.315 was enjoined. Of course, the School District had already paid the Diverted Withhold by the time the June 15, 2006 Order issued. The November 21, 2006 Order made it clear that the June 15, 2006 Order did not require the School District to be repaid. If the voluntary payment doctrine does not apply to these facts, it is difficult to conceive when it would apply.[33]

---

**33.** To be technically accurate, what permitted the Charter Schools to receive the Diverted Withhold was not the State's enactment of section 33.315, but instead the School District's voluntary payment of same—an observation which solidifies the connection between the voluntary payment doctrine and the notions of equity and good conscience which

The School District argues that it is not required to establish mistake, fraud, or duress to recover on a claim for money had and received, and that Missouri law focuses only on whether it is unjust for a recipient to retain money to which the recipient is not entitled. The School District's reliance on *Catapult Learning, LLC v. Bd. of Educ. of City of St. Louis*, 2008 WL 1349646 (E.D.Mo.2008) for this proposition is unavailing. In *Catapult*, the defendant filed a motion to dismiss a petition which asserted a claim for money had and received. *Id.* at *1. The federal court applied Missouri law to reject the motion to dismiss, noting that to *state a claim* for money had and received a plaintiff need only plead the three essential elements of the claims: (i) defendant's receipt of plaintiff's money, (ii) defendant's appreciation of a benefit, and (iii) that retention of the money would be unjust. *Id.* at *2. The federal court observed that it was not necessary to plead "that the money was mistakenly or improperly paid to a defendant." *Id.* That is true. This conclusion has no bearing, however, on determining whether the facts presented in a case negate the affirmative defense of voluntary payment—an issue not before the federal court in *Catapult*. The School District's reliance on *Catapult* conflates the essential elements of a claim of money had and received with the facts necessary to negate the affirmative defense of voluntary payment.

The School District also relies on *Carpenter v. Countrywide Home Loans, Inc.*, 250 S.W.3d 697 (Mo. banc 2008) where our Supreme Court rejected a title company's assertion of the voluntary payment doctrine as an affirmative defense to a claim for money had and received seeking to recover fees paid for a title company's unauthorized practice of law. Again, the

School District's reliance is unavailing. *Carpenter*, and the case it cites, *Eisel v. Midwest BankCentre*, 230 S.W.3d 335 (Mo. banc 2007), recognize a narrow exception to the voluntary payment doctrine for violations of section 484.010 *et seq.* (describing the unauthorized practice of law), and hold that claims under that statute are " 'not subject to waiver, consent or lack of objection by the victim.' " *Id.* at 703 (quoting *Eisel*, 230 S.W.3d at 339–40). *Carpenter* has no application to this case.

The School District nonetheless argues that the Supreme Court in *Carpenter* held that the voluntary payment doctrine should not be applied where it would be "illogical and inequitable" to do so. *Id.* The School District argues this is a principle of general application, and that it would be "illogical and inequitable" to apply the voluntary payment doctrine in this case. We disagree with the School District's reading of *Carpenter*. The Supreme Court did not abrogate the voluntary payment doctrine, or generally limit its application subject to a test of logic and equity. In fact, the Supreme Court restated the doctrine, endorsing its continued viability. *Id.* ("The doctrine provides a person, who voluntarily pays money with full knowledge of the facts, in absence of fraud or duress, cannot recover it back and is a recognized defense to an action for money had and received.") (citing *Jurgensmeyer*, 727 S.W.2d at 444; *American Motorists*, 447 S.W.2d at 812–13). Indeed, the year after its decision in *Carpenter*, the Supreme Court reiterated its recognition of the voluntary payment doctrine as an affirmative defense to a claim for money had and received in *Huch*, 290 S.W.3d 721. In *Huch*, the Supreme Court further explained the narrow exception to the doctrine recognized in *Eisel* and *Carpenter*,

serve as the underpinnings for the claim at

law for money had and received.

noting that where the Missouri legislature has seen fit to protect consumers from a class of wrongdoers by the enactment of legislation like section 484.010 *et seq.* (forbidding the unauthorized practice of law) or Chapter 407 (Missouri's Merchandising Practices Act), permitting one within the class of wrongdoers to avoid liability for the unfair practice by reliance on the voluntary payment doctrine "would nullify the protections of the act and be contrary to the intent of the legislature." *Id.* at 727. We are not faced with such a scenario in this case.

The Charter Schools' affirmative defense of voluntary payment was not negated by the uncontested facts in this case, and was established by the uncontested facts in this case. It was legally erroneous for the trial court to grant summary judgment in favor of the School District, and to deny summary judgment in favor of the Charter Schools, on the claim for money had and received.

We reverse the entry of judgment in favor of the School District and against the Charter Schools on Count I of the Second Amended Cross–Claim. Pursuant to Rule 84.14, we enter judgment in favor of the Charter Schools and against the School District on Count I of the Second Amended Cross–Claim.

## Conclusion

The Second Amended Memorandum, Order and Judgment entered by the trial court on October 21, 2011 is reversed and vacated. Pursuant to Rule 84.14, we enter judgment as follows:

Judgment is entered in favor of each of the State defendants and each of the Charter Schools [34] and against the School District on Count I (declaratory judgment) of the School District's Third Amended Petition.

Judgment is entered in favor of each of the State defendants and each of the Charter Schools and against the School District on Count II (breach of contract) of the School District's Third Amended Petition.

Judgment is entered in favor of each of the State defendants and each of the Charter Schools and against the School District on Count III (review of administrative decision) of the School District's Third Amended Petition.

Judgment is entered in favor of each of the Charter Schools and against the School District on Count I (money had and received) of the School District's Second Amended Cross–Claim.

Any other claims, counterclaims, or cross-claims (if any) asserted and not expressly disposed of by this Opinion are dismissed with prejudice as moot.

Costs are assessed to the School District.

All concur.

---

34. Though Counts I, II, and III of the School District's Third Amended Petition did not expressly seek relief from the Charter Schools, and though the Judgment entered by the trial court did not grant relief on these counts against the Charter Schools, the Charter Schools intervened in this case, and aligned with the State in doing so. The Charter Schools answered the Third Amended Petition, and filed summary judgment motions addressing the claims in the Third Amended Petition. We enter judgment in their favor on Counts I, II, and III of the Third Amended Petition out of an abundance of caution, and because it is our express intent that as a result of the judgment we hereby enter, all matters or claims framed by the parties' pleadings will have been fully and finally resolved.